**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN DOE,<br>             Plaintiff,<br><br>v.<br><br>THE ROMAN CATHOLIC DIOCESE<br>OF GREENSBURG, *et al.*,<br><br>             Defendants. | Civ. Action No. 20-1750 (EGS) |

**MEMORANDUM OPINION**

## I.   Introduction

Plaintiff John Doe ("Plaintiff" or "Mr. Doe") brings this case against Defendants Roman Catholic Diocese of Greensburg; Edward C. Malesic, Bishop of the Diocese of Greensburg; St. John the Baptist and St. Joseph parish, successor entity to St. Joseph's Roman Catholic Church in Everson, Pennsylvania (collectively, hereinafter "Greensburg Defendants"); and Donald Wuerl ("Mr. Wuerl"), the former Bishop of the Diocese of Pittsburgh and former Archbishop of the Roman Catholic Archdiocese of Washington, D.C., based on alleged sexual abuse Mr. Doe suffered as a minor.[1] *See* Ex. A Notice of Removal ("Compl."), ECF No. 1-1; Mot. Proceed via Pseudonym, ECF No. 5-

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

1. The Greensburg Defendants and Mr. Wuerl both seek to have this case dismissed. *See* Motion to Dismiss ("Greensburg Defs.' Mot."), ECF No. 36; Defendant Donald W. Wuerl's Motion to Dismiss ("Def. Wuerl's Mot."), ECF No. 37. Mr. Doe opposes both motions. *See* Mem. in Opp'n to Greensburg Defendants' Motion to Dismiss ("Pl.'s Opp'n to Greensburg Defs."), ECF No. 39; Mem. in Opp'n to Donald Wuerl's Motion to Dismiss ("Pl.'s Opp'n to Def. Wuerl"), ECF No. 40.

Upon consideration of the motions, responses, and the replies thereto, the applicable law and regulations, the entire record and the materials cited therein, the Court **GRANTS IN PART** and **DENIES IN PART** the Greensburg Defendants' Motion to Dismiss, ECF No. 36; and **DENIES** Mr. Wuerl's Motion to Dismiss, ECF No. 37.

## II.  Factual and Procedural Background

On June 5, 2020, Mr. Doe brought suit in the Superior Court of the District of Columbia ("Superior Court") against Defendants alleging the following causes of action: (1) Count I—Negligence, *see* Compl.*,* ECF No. 1-1 ¶¶ 52-60; (2) Count II—Negligent Supervision, Monitoring, Training, and Retention, *see id.* ¶¶ 61-70; (3) Count III—Breach of Special Duty, *see id.* ¶¶ 71-78; (4) Count IV—Constructive Fraud, *see id.* ¶¶ 79- 85; and (5) Count V—Civil Conspiracy to Commit Fraud, *see id.* ¶¶ 86-93. The Diocese and Parish are named as defendants on all counts.

Bishop Malesic and Cardinal Wuerl are named only in Count V of the Complaint.[2]

Mr. Doe seeks compensatory and punitive damages on his claims, each of which arise from the alleged sexual abuse he suffered as a minor from approximately 1991 to 1997—or from when he was between 11 and 17 years old—largely at the hands of Joseph L. Sredzinski, the now-deceased priest of Saint Joseph's Roman Catholic Church ("the Parish"). Compl., ECF No. 1-1 ¶¶ 3, 34. At the time, Mr. Doe resided in Westmoreland County, Pennsylvania, and attended the Parish, located within the Diocese of Greensburg (the "Greensburg Diocese"). *Id.* ¶¶ 4, 6, 8, 29. During this time, Mr. Sredzinski served as priest of the Parish, and Mr. Wuerl served as bishop of the Diocese of Pittsburgh, before beginning his service as Archbishop of Washington in 2006. *Id.* ¶ 9.

Mr. Doe asserts that he was groomed by Mr. Sredzinski starting at the age of 9. *See* Compl., ECF No. 1-1 at ¶ 29-30. Mr. Doe details an escalating pattern of alleged sexual abuse over the course of his childhood. In the second half of 1991, when he was 11 years old, he alleges that Mr. Sredzinski took him to the Parish's rectory, stripped him naked, and kissed him

---

[2] Bishop Malesic is no longer the Bishop of the Diocese of Greensburg and was installed as the new Bishop of the Diocese of Cleveland on September 14, 2020. *See* Greensburg Defs.' Mot., ECF No. 36 at 12-13.

all over his body, including on Mr. Doe's anal area. *Id.* ¶ 31.
Mr. Doe contends that on an occasion soon thereafter, Mr.
Sredzinski anally penetrated him. *Id.* ¶ 32. Mr. Doe alleges that
this continued for several years, with Mr. Sredinzki repeatedly
raping him violently and forcing him to perform fellatio,
"claiming Plaintiff was Sredzinski's servant through God and
needed to internalize Sredzinski's seed." *Id.* ¶¶ 32-34, 40. Mr.
Doe alleges that on multiple occasions, Mr. Sredinzski invited
other priests to the Rectory, who then purportedly took turns
raping him. *Id.* ¶ 35.

As per the Complaint, the sexual abuse allegedly occurred
at the Parish rectory in Pennsylvania and on approximately
thirty trips to Washington, D.C., during which Mr. Sredzinski
shared a hotel room with Mr. Doe and raped him on every
occasion. *Id.* ¶¶ 36, 39-40. On a few of these trips, Mr. Doe
alleges that Defendant Cardinal Wuerl was present in the hotel
room and witnessed Mr. Doe being abused by Mr. Sredzinski;
rather than stopping the abuse, Mr. Wuerl allegedly proceeded to
masturbate. *See id.* ¶ 42. Mr. Doe asserts that many of these
trips were church-sponsored, and coordinated by the Greensburg
Diocese, Bishops of that Diocese, and the Parish, including an
annual trip to a pro-life rally, sports competitions, and other
political or religious events. *Id.* ¶¶ 31, 35-38. Others trips to
D.C. were vacations. *Id.* ¶ 36.

Mr. Doe asserts that he reported the sexual abuse, to no avail, at several points. *Id.* ¶¶ 44-46. At age 13, Mr. Doe states that he reported the abuse to the Diocese in the form of two messages left with the office of the Bishop of the Diocese, but his messages were never returned. *Id.* ¶ 44. He states that he also reported the abuse to two different officials at his Catholic high school, which is under the Diocese's control. *Id.* ¶ 46. He adds that at age 15, he allegedly confronted Mr. Wuerl, who denied ever witnessing the abuse and stated that Mr. Doe must be lying or hallucinating. *Id.* ¶ 45.

In addition to his own purported reports of the alleged sexual abuse, Mr. Doe points to evidence that the Diocese and Parish had actual or constructive knowledge that Mr. Sredzinski had inappropriate relationships with minor boys since at least as early as 1991. *See generally* Office of the Pennsylvania Attorney General, *Pennsylvania Diocese Victims Report* ("Grand Jury Report"), *available at* https://www.attorneygeneral.gov/report/ (last accessed January 5, 2022). The Court takes judicial notice of the evidence to which Mr. Doe refers, a multi-year Pennsylvania Grand Jury Investigative Report on child sexual abuse in the Catholic Church in Pennsylvania, published in 2018. *See Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (stating that

"[c]ourts  in  this  jurisdiction  have  frequently  taken  judicial

notice  of  information  posted  on  official  public  websites  of

government  agencies," and  collecting  cases).  According  to  the

Grand  Jury  Report,  Tim  Shoemaker,  then  the  Mayor  of  Everson,

contacted  Father  Roger  Statnick,  then  a  priest  of  the  Diocese,

as  far  back  as  1991,  to  inform  him  of  his  concerns  about  Mr.

Sredizski's  inappropriate  relationships  with  multiple  local

boys,  including  an  incident  where  he  was  found  in  a  parked  car

with  a  young  boy  in  a  cemetery  late  at  night.  *See* Office  of  the

Pennsylvania  Attorney  General,  Grand  Jury  Report  at  506,

*available at* https://www.attorneygeneral.gov/report/.  As  per  the

Grand  Jury  Report,  on  January  14,  1994,  the  Bishop  of  the

Diocese  himself  wrote  a  letter  to  Mr.  Sredzinski's  sister

acknowledging  the  Mayor's  outreach  and  the  dangers  posed  by  Mr.

Sredzinski's  actions  in  terms  of  criminal  and  civil  liability.

*Id.* at  509.  The  Grand  Jury  Report  concluded  that  the

Pennsylvania  dioceses  (including  the  Diocese  of  Greensburg)  were

far  more  complicit  in  covering  up  abuse  by  priests  than  was

previously  known  by  the  public.  The  Report  stated  as  follows:

> While  each  church  district  had  its
> idiosyncrasies,  the  pattern  was  pretty  much
> the  same.  The  main  thing  was  not  to  help
> children,  but  to  avoid  'scandal.'  That  is  not
> our  word,  but  theirs;  it  appears  over  and  over
> again  in  the  documents  we  recovered.  Abuse
> complaints  were  kept  locked  up  in  a  'secret
> archive.'  That  is  not  our  word,  but  theirs;
> the  church's  Code  of  Canon  Law  specifically

> requires the diocese to maintain such an
> archive. Only the bishop can have the key.

*Id.* at 2. The Grand Jury Report also made findings of circumstantial evidence that were suggestive of a conspiracy to conceal abuse amongst different dioceses and leaders. *Id.* at 297 (noting that the dioceses had such commonalities in their plans to fraudulently conceal sexual abuse from law enforcement, the public, and potential victims that "[i]t seemed as if there was a script").

Mr. Doe contends that none of the information as to Mr. Sredinzki's alleged child abuse was ever communicated to him, his family, or anyone else who could have protected him from the ensuing events. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 11. Instead, he states that he and his family "reasonably relied on the Diocese and Parish's omission of these facts, and/or statements in sermons, catechism classes, and other teachings that Catholic priests were trustworthy authority figures." Compl., ECF No. 1-1 ¶ 20, 73. Mr. Doe alleges that the abuse left him with serious and permanent physical and emotional injuries, including depression, post-traumatic stress disorder, hypertension, panic attacks, difficulties with trust and human interactions, and a loss of faith, educational and employment opportunities. *See* Compl., ECF No. 1-1 at 10-11.

Mr. Doe brought suit against the Defendants on June 5, 2020.[3] *See* Compl., ECF No. 1-1. Mr. Wuerl then removed the action from Superior Court to this Court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 on June 27, 2020. *See* Notice of Removal, ECF No. 1. The Greensburg defendants and Mr. Wuerl both subsequently moved to have the case dismissed. *See* Greensburg Defs.' Mot., ECF No. 36; Def. Wuerl's Mot., ECF No. 37. Mr. Doe, who has been granted leave by the Court to proceed under a pseudonym, *see* Memorandum Opinion, ECF No. 43; opposes both motions. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39; Pl.'s Opp'n to Def. Wuerl, ECF No. 40. The motions are ripe and ready for adjudication.

---

[3] The Greensburg Defendants mention a "nearly identical" action commenced by Mr. Doe on August 7, 2020. *See* Greensburg Defs. Mot., ECF No. 36. at 6, 39. Mr. Doe explains that the action "was apparently the result of a misunderstanding between Plaintiff and a different law firm that is not involved in the instant action." Pl.'s Opp'n to Greensburg Defs., ECF No. 39. Since the action was voluntarily discontinued, the Court finds that it has no relevance to the present proceedings. *See generally* Docket for *MR v. Roman Catholic Diocese of Greensburg*, et. al., No. 2783 of 2020 (Court of Common Pleas of Westmoreland County, Pennsylvania).

### III. Standards of Review

#### A. Rule 12(b)(2) Motion to Dismiss

Under Rule 12(b)(2), a defendant may move to dismiss an action when the court lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). On such a motion, the plaintiff bears the burden of establishing a factual basis for the exercise of personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y.*, 894 F.2d 454, 456 (D.C. Cir. 1990). To meet this burden, the plaintiff must allege specific facts that connect each defendant with the forum. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). The plaintiff cannot rely merely on conclusory allegations. *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). The court may consider, receive, and weigh affidavits and other relevant materials outside of the pleadings to assist it in determining the pertinent jurisdictional facts. *U.S. v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

#### B. Rule 12(b)(6) Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give

the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell At. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). While detailed factual allegations are not required, a complaint must contain "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When ruling on a Rule 12(b)(6) motion, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624 (D.C. Cir. 1997). In so doing, the court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678. The plaintiff must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted).

### C. Fraud Claims

"In alleging fraud," "a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b); *see also FTC v. Cantkier*, 767 F. Supp. 2d 147, 151 (D.D.C. 2011) ("Rule 9(b) imposes a heightened pleading standard for fraud claims."). To meet this "enhanced pleading standard," a plaintiff must "provide a defendant with notice of the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Id.* (quoting *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 114 (D.D.C. 2009)). In other words, "[t]he plaintiff must 'state the time, place, and content of the false representations, the fact misrepresented . . . and identify individuals allegedly involved in the fraud.'" *Id.* (internal citation omitted).

Rule 9(b) also governs constructive fraud claims, which apply to innocent or negligent (rather than intentional) misrepresentation. *See Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 206 (D.D.C. 2016) ("Like claims for fraudulent misrepresentation, Rule 9(b)'s particularity requirements apply to claims for negligent misrepresentation."). Rule 9(b) further governs claims of conspiracy to commit fraud. *See, e.g.*, *Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42 (D.D.C. 2013) ("The Geiers' civil conspiracy allegations are threadbare accusations that fail to state a claim, let alone

meet the heightened pleading standard required by Rule 9(b).")
(internal citation omitted); *Silvercreek Mgmt., Inc. v.
Citigroup, Inc.*, 248 F. Supp. 3d 428, 447 (S.D.N.Y. 2017) ("A
claim for conspiracy to commit fraud is also subject to Rule
9(b)'s heightened pleading standard.").

### D. Rule 12(b)(7) Motion to Dismiss

Under Rule 12(b)(7), a defendant may seek dismissal of a
complaint for failure to join a required party under Rule 19.
Fed. R. Civ. P. 12(b)(7). The burden is on the defendant seeking
dismissal for failure to name an absent party to show the nature
of the interest possessed by an absent party and that the
protection of that interest will be impaired by the absence.
*Citadel Inv. Grp., L.L.C. v. Citadel Capital Co.,* 699 F. Supp.
2d 303, 317 (D.D.C. 2010). In evaluating the need for the absent
person under Rule 12(b)(7), the court must accept as true the
allegations in the complaint but may also consider affidavits
and other extrinsic evidence outside of the pleadings submitted
by the parties. *16th & K Hotel, LP v. Commonwealth Land Title
Ins. Co.*, 276 F.R.D. 8, 12-13 (D.D.C. 2011).

### IV.  Analysis

The Greensburg Defendants present nine legal arguments in
their Motion to Dismiss. *See* Greensburg Defs.' Mot., ECF No. 37
at 9. They argue that the first two arguments, lack of personal
jurisdiction and a failure to join required parties, warrant a

dismissal of the Complaint in its entirety. *See id.* at 10. The Greensburg Defendants allege that the seven remaining arguments "warrant, at a minimum, the dismissal of some or most of the parties named and the claims asserted." *Id.* Mr. Wuerl argues that Mr. Doe's "conspiracy claim fails to meet the Rule 12(b)(6) and 9(b) pleading standards on multiple levels." Def. Wuerl's Mot., ECF No. 37 at 9. Since several arguments presented by the Greensburg Defendants and Mr. Wuerl are overlapping, the Court considers all the arguments together.

### A. The Court Has Personal Jurisdiction Over the Greensburg Defendants

#### 1. The Court Has Personal Jurisdiction Over the Diocese and Parish Under D.C. Code § 13-423(a)(3)

First, the Greensburg Defendants argue that the Court lacks personal jurisdiction, because the Complaint "alleges no cognizable connection between the Greensburg Defendants and the District of Columbia sufficient to confer either general or specific personal jurisdiction over them in this Court." Greensburg Defs.' Mot., ECF No. 37 at 9. Mr. Doe does not dispute the lack of general jurisdiction but argues instead that this Court has specific jurisdiction.[4] Specifically, he responds that many of the trips to the District of Columbia ("D.C.") were "church-sponsored events: an annual Catholic pro-life rally,

---

[4] The Court therefore does not reach the Greensburg Defendants' arguments as to a lack of general jurisdiction.

basketball and bowling competitions in D.C., and other events in Washington" that the Greensburg defendants have been coordinating "for decades." Pl.'s Opp'n to Greensburg Defs.' Mot., ECF No. 39 at 7, 15. He contends that specific jurisdiction attaches to the Diocese and Parish because the Parish officials supervising these trips were acting as agents under D.C.'s long arm statute. *See id.*; D.C. Code § 13-423(a)(3). Drawing all inferences in the Plaintiff's favor, the Court agrees with Mr. Doe as to the allegations pertaining to Church-sponsored trips.

D.C.'s long arm statute provides that this Court has personal jurisdiction over a party "who acts directly or by an agent" as to claims arising from the party's "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia." D.C. Code § 13-423(a)(3). Where one acts as an official of a defendant and on such defendant's behalf, an agency relationship can exist for the purposes of specific personal jurisdiction. *See Daughtry v. Arlington County, Va.*, 490 F. Supp. 307, 313 (D.D.C. 1980). To establish personal jurisdiction, the defendant must have "minimum contacts" with D.C. *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). "It is essential that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the

benefit and protection of its laws." *Heller v. Nicholas Applegate Capital Mgmt., LLC*, 498 F. Supp. 2d 100, 109 (D.D.C. 2007).

When responding to a motion to dismiss based on personal jurisdiction, without an evidentiary hearing, a plaintiff need only make a *prima facie* showing that the court has personal jurisdiction over the defendant. *Edmond v. U.S. Postal Service General Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991). To meet this burden, the plaintiff must allege specific facts that connect each defendant with the forum. *Second Amendment Found.*, 274 F.3d at 524. Any "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." *Crane*, 894 F.2d at 456 (*citing Reuber v. United States*, 750 F.2d 1039, 1052 (D.C. Cir. 1984)).

Here, Mr. Doe alleges that he "was abused many times on approximately thirty trips to Washington D.C., both church-sponsored trips and otherwise, including vacations." Compl., ECF No. 1-1 ¶ 36. He alleges that these trips to D.C. included "an annual Catholic pro-life rally as well as other political events," and "basketball and bowling competitions with other churches." *Id.* ¶¶ 37-38. Mr. Doe alleges that these trips were coordinated by Mr. Sredzinski "in conjunction with the DIOCESE, bishops of the DIOCESE, and/or the PARISH." *Id.* On every trip to D.C., Mr. Doe alleges that he "shared a hotel room and slept in

the same bed" as Mr. Sredzinski, and on every trip, "[Mr.] Sredzinski violently raped [Mr. Doe] and forced him to perform fellatio." *Id.* ¶¶ 39-40. Mr. Doe also refers to evidence indicating that the Diocese and Parish were organizing an overnight March for Life trip as recently as 2020. *See* January 12, 2020 Parish Newsletter, Exhibit 1, ECF No. 39-1 at 6 (stating that "[y]oung people in grades 8-12 and their adult chaperones are invited to journey to the March for Life in Washington, D.C., Jan. 23-24.").

The Greensburg Defendants respond that "even assuming that these overnight trips and vacations occurred, none of the Greensburg Defendants would have sanctioned, coordinated, or approved of them during the relevant time period, especially not Bishop Malesic." Greensburg Defs.' Mot., ECF No. 36 at 19; *see also* Exhibit C, Affidavit of Monsignor Larry J. Kulick ("Kulick Affidavit"), ECF No. 39 ¶¶ 9-14 (stating that during the time period of 1991-1997, neither the Diocese, nor its Parishes, would have "sanctioned, coordinated, sponsored, or approved" of "personal vacations," "basketball and bowling competitions," or "overnight trips" to the District of Columbia "involving parishioners and clerics staying together in the same private hotel room," and adding that the Diocese and its Parishes organized at most once a year day trips for the annual Catholic pro-life rally). The Greensburg Defendants add that they had no

duty to oversee these "alleged unsanctioned overnight trips and personal vacations" to the District of Columbia and therefore did not purposefully avail themselves of the privileges of the District of Columbia. Greensburg Defs.' Mot., ECF No. 36 at 19.

The Court finds that Mr. Doe has made a *prima facie* showing that the court has personal jurisdiction over the Diocese and Parish. *See Edmond*, 949 F.2d at 424. Mr. Doe has alleged that several trips to D.C. were Church sponsored and organized in conjunction with the Diocese and Parish, such that Mr. Sredzinski was acting as an agent of the Diocese and Parish. *See* Compl., ECF No. 1-1 ¶¶ 36-38. Although the Greensburg Defendants respond that the Diocese and its Parishes would not have organized any such trips, *see* Greensburg Defs.' Mot., ECF No. 36 at 19; Mr. Doe provides evidence that the Church has organized overnight trips as recently as 2020. *See* January 12, 2020 Parish Newsletter, Exhibit 1, ECF No. 39-1 at 6. There is a discrepancy between the Greensburg Defendants' insistence that none of the trips during 1991-1997 would have been overnight trips, and Mr. Doe's allegations, supported by the later Parish Newsletter that invites "Young people in grades 8-12 and their adult chaperones" to the March for Life Rally from "Jan 23-24," a period of two days, with events spread across both days. *Compare* Kulick Aff., Exhibit C, ECF No. 36-2 ¶ 11 *with* January 12, 2020 Parish Newsletter, Exhibit 1, ECF No. 39-1 at 6. The Greensburg

Defendants do not explain why they organize such trips now, but allegedly only had day trips previously. There is also a discrepancy between the assertion that the Greensburg Defendants have no specific acts directed toward D.C., and the March for Life trips advertised by the Diocese to D.C., as well as the other trips Mr. Doe asserts that the Church organized.[5] *Compare* Kulick Aff., Exhibit C, ECF No. 36-2 ¶ 11; January 12, 2020 Parish Newsletter, Exhibit 1, ECF No. 39-1 at 6 *with* Greensburg Defs.' Mot.*,* ECF No. 36 at 22.

At this juncture, the Court must draw all factual discrepancies in favor of the Plaintiff. *See Crane*, 894 F.2d at 456. Doing so here, the Court concludes that it can exercise personal jurisdiction over the Diocese and Parish since Mr. Doe's allegations adequately establish their "minimum contacts"

---

[5] The Kulick affidavit falls far short of stating that the church trips Mr. Doe alleges took place, including sporting competitions, did not happen. *See generally* Kulick Aff., Exhibit C, ECF No. 36-2. The affidavit merely states that the Greensburg Defendants "would" not have approved any "overnight trips to the District of Columbia involving parishioners and clerics staying together in the same private hotel rooms" whether for "personal vacations" or "basketball and bowling competitions." *Id.* at 45-46. However, Mr. Doe is not alleging the church approved of Mr. Sredzinski staying in the same room as him; he is alleging that negligence by the Greensburg Defendants allowed him to be abused at church-sponsored trips. To that end, the affidavit does not establish that the Church "did not" organize any overnight trips of the sort Mr. Doe alleges. It does not even state the Church "would" not have organized any basketball or bowling trips to D.C.

to D.C. as a party "who acts directly or by an agent" as to
claims arising from the party's "causing tortious injury in the
District of Columbia by an act or omission in the District of
Columbia." D.C. Code § 13-423(a)(3). Mr. Doe's allegations are
sufficient at this juncture to show that the Greensburg
Defendants purposefully availed themselves of the privileges of
D.C. and created a "substantial connection with the forum."
*Walden*, 134 S. Ct. 1115.

In addition, this case, to the extent it involves church-
sponsored and organized events, is easily distinguished from *Doe
v. Archdiocese of Philadelphia*, No. CV 19-20934(FLW), 2020 WL
3410917, at *4 (D.N.J. June 22, 2020), which held that a
priest's conduct in transporting plaintiff to another state for
purposes of sexual abuse did not subject the Archdiocese of
Philadelphia to the personal jurisdiction of the New Jersey
courts. By virtue of the alleged abuse occurring at church-
sponsored or organized events, there is no conflict here with
the legal standard that "unilateral activity of a third party
cannot satisfy the requirement that Defendant have minimum
contacts with the forum state."[6] *Id.* The exception is for trips

---

[6] For similar reasons, the Court need not address at this stage
whether the Greensburg Defendants had any duty as a matter of
law to oversee "unsanctioned" trips. *See* Greensburg Defs.' Mot.,
ECF No. 36 at 21.

that were not church-sponsored or were vacations. *See* Compl.,
ECF No. 1-1 ¶ 36. Where Mr. Sredzinski was acting on his own
behalf, rather than as an agent of the church, his behavior was
the "unilateral activity of a third party" that cannot be held
to provide specific jurisdiction over the Greensburg Defendants.

Finally, even if the Diocese and Parish would never have
approved trips to D.C. that involved "parishioners and clerics
staying together in the same private hotel rooms," Kulick Aff.,
Exhibit C, ECF No. 36-2 ¶ 13; that does not preclude the
possibility that their agent deviated from the expected standard
and was not adequately supervised. Moreover, the Greensburg
Defendants emphasis on the fact that most of the alleged
negligence took place in Pennsylvania, *see* Greensburg Defs.'
Mot., ECF No. 36 at 21; is a question unrelated to specific
jurisdiction, which asks simply whether the Greensburg
Defendants had minimum contacts with D.C. For these reasons, the
Court concludes that it has specific personal jurisdiction over
the Diocese and Parish under D.C. Code § 13-423(a)(3) with
regard to Mr. Doe's claims arising out of the church-sponsored
trips to D.C.

## 2. The Court Also Has Personal Jurisdiction Over the Greensburg Defendants Under D.C. Code § 13-423(a)(4)

The Greensburg defendants argue that even if the "unsanctioned" trips to the District of Columbia ("D.C.") and "personal vacations taken by Plaintiff and Father Sredzinski" are enough to confer specific jurisdiction, the Court must limit its exercise of jurisdiction "*only* to those alleged acts or omissions that occurred in the District of Columbia, and not Pennsylvania." Greensburg Defs.' Mot., ECF No. 36 at 9-10. Mr. Doe responds that the Court does have jurisdiction over the Greensburg Defendants' conduct outside D.C., because they had a "persistent course of conduct" in D.C. that caused tortious injury [the alleged repeated rape of a minor] by an act [the Diocese and Parish's failure to supervise, monitor, and train Mr. Sredzinski] that occurred both within and outside D.C. The Court agrees with Mr. Doe, insofar that it has personal jurisdiction over acts and omissions leading to injury in D.C.

The District of Columbia's long-arm statute provides, in relevant part:

> "A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he . . . engages in any other

> persistent course of conduct . . . in the
> District of Columbia.

D.C. Code § 13-423(a). The "persistent course of conduct" provision "is satisfied by connections considerably less substantial than those it takes to establish general . . . jurisdiction," and the connections can "be unrelated to the claim in suit." *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987) (Ginsburg, J.) (citing cases). Furthermore, such persistent course of conduct establishes the "minimum contacts" between the defendant and D.C. "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In addition, § 13-423(b) provides that when jurisdiction over a person is based on the long arm-statute, "only a claim for relief arising from acts enumerated in this section may be asserted against him." D.C. Code § 13-423(b).

Because of § 13-423(b), the Greensburg Defendants interpret the long-arm statute to mean that this Court's jurisdiction is limited to "to those acts or omissions that occurred in the District of Columbia." Greensburg Defs.' Mot., ECF No. 36 at 24. However, this interpretation confuses §13-423(a) and (b). Section 13-423(a) plainly covers "an act or omission outside the District of Columbia," so long as it leads to "tortious injury in the District of Columbia." The question is not whether the

act or omission occurred in D.C., but whether it led to injury
in D.C. The limitation in §13-423(b) to "a claim for relief
arising from acts enumerated in this section" includes acts
outside D.C. that cause tortious injury in D.C., so long as the
person "(i) regularly does or solicits business, (ii) engages in
any other persistent course of conduct, or (iii) derives
substantial revenue from goods used or consumed, or services
rendered, in the District of Columbia." D.C. Code § 13-
423(a)(4).

Nor is Mr. Doe's interpretation of § 13-423(a) entirely
correct. Mr. Doe maintains that "[i]f Greensburg Defendants
engaged in a persistent course of conduct in the District, then,
this rule would thus provide a basis for jurisdiction not just
for the Diocese and Parish's misconduct with respect to church-
sponsored trips, but also for any of the Greensburg Defendants'
wrongdoing anywhere that caused injury in the District of
Columbia, even on vacations." Pl.'s Opp'n to Greensburg Defs.,
ECF No. 39 at 18. However, §13-423(a) provides for personal
jurisdiction only over a person "who acts directly or by an
agent." Although the Church may have organized trips to D.C. at
which its direct actions (alleged negligence) caused tortious
injury to Mr. Doe, and Mr. Sredinzki may have been acting as an
agent of the church on church-sanctioned trips, it does not
follow that Mr. Sredzinski was acting as an agent of the

23

Greensburg Defendants when he was on vacation.  Personal jurisdiction over acts or omissions outside D.C. is limited to those that caused injury, directly or when Mr. Sredzinski was acting as an agent on church-sponsored trips, so long as there was a "persistent course of conduct."

Here, all the Greensburg Defendants engage in a consistent course of conduct in D.C. One example is the March for Life. As Mr. Doe points out, the Diocese's Office of Faith, Family, and Discipleship sponsors an annual "March for Life Youth Pilgrimage," where the Diocese organizes and coordinates an overnight "pilgrimage" trip to Washington, D.C. for their youth. *See March for Life Youth Pilgrimage*, Roman Catholic Diocese of Greensburg, https://www.dioceseofgreensburg.org/youth/Pages/marchforlifeya.a spx; *see also Energy Automation Systems, Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 n. 1 (M.D. Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website.") (Citing *City of Monroe Emples. Ret. Sys. v. Bridgestone Corp.*, 387 F.3d 468, 472, n. 1 (6th Cir.2004), *amended and superseded on other grounds*, 399 F.3d 651 (6th Cir.2005)). The Parish has also coordinated bus trips for these events in the past. *See Nature Programs Continue at Library*, Trib Live, https://archive.triblive.com/news/nature-programs-continue-at-library-2/ (advertising, in 2009, that "St.

Joseph's parish and youth group will take a charter bus to Washington, D.C., Jan. 22 for the 36th annual 'March for Life'"); *see also* January 12, 2020 Parish Newsletter at 6, Exhibit 1, ECF No. 39. Mr. Malesic too engages in a persistent course of conduct in D.C., stating in a press release letter that one "of the most important things [he] does every year is show [his] support for the March for Life in Washington, D.C." Edward C. Malesic, *Bishop Pro-Life Letter 2019*, https://www.dioceseofgreensburg.org/about/Documents/Bishop%20Malesic%20Media/Bishop% 20Pro-Life%20Letter%202019.pdf. Although the Greensburg Defendants allege the letter "does not mention the coordinating of trips or overnight stays in the District of Columbia," it mentions that Bishop Malesic shows his support "every year" and will do so again by being present at the March, suggesting he attends on an annual basis. *See id.*

In addition, Mr. Doe points out several other trips the Greensburg Defendants organize to D.C. for parishioners both old and young. *See* June 11, 2017, Parish Newsletter at 6, Exhibit 2, ECF No. 39-2 at 6; June 25, 2017 Parish Newsletter, Exhibit 3, ECF No. 39-3 at 6. The organization of these trips demonstrates a "persistent course of conduct," D.C. Code § 13-423 (a)(4); and creates the minimum contacts necessary. *Int'l Shoe*, 326 U.S. at 316.

Accordingly, the Court has personal jurisdiction over all three Greensburg Defendants under D.C. Code § 13-423(a)(4), for acts or omissions outside of the District of Columbia that caused tortious injury within the District.

### B. The Vatican and the Diocese of Pittsburgh are Not Required Parties

The Greensburg Defendants contend that, in light of Fed. R. Civ. P. 19 and the absence of the Vatican and the Diocese of Pittsburgh as parties, "the court cannot accord complete relief among existing parties" and thus the Complaint must be dismissed. Greensburg Defs.' Mot., ECF No. 36 at 25. Mr. Doe responds that "the Vatican and the Diocese of Pittsburgh are not required to be joined under Rule 19 and that equity and good conscience does not [sic] warrant dismissal of Plaintiff's complaint." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 22. The Court agrees that Rule 19 does not require the joinder of the Diocese of Pittsburgh or the Vatican.

Rule 19(a) provides, in relevant part, that "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties[.]" Fed. R. Civ. P. 19(a)(1)(A). Dismissal under Rule 12(b)(7) is "warranted only when the defect is serious and cannot be cured." *Direct Supply, Inc. v. Specialty Hospitals of America, LLC,* 878 F. Supp. 2d 13,

23 (D.D.C. 2012) (internal citations omitted). For the purposes of a Rule 12(b)(7) motion, the court must accept the complaint's allegations as true, and may also consider matters outside the pleadings when determining whether Rule 19 requires that a party be joined. *Id.* Defendant, as the moving party, bears the burden to demonstrate an absent party is required. *Ilan-Gat Engineers, Ltd. v. Antigua Int'l Bank,* 659 F.2d 234, 242 (D.C. Cir. 1981).

However, "[i]t has long been the rule that it is not necessary [under Rule 19(a)] for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990). Co-conspirator joint tortfeasors are "not indispensable parties." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *see also Cronin v. Adam A. Weschler & Son, Inc.*, 904 F. Supp. 2d 37, 41 (D.D.C. 2012) ("Rule 19 does not require the joinder of joint tortfeasors" because "joint and several liability permits the plaintiff to recover full relief from any one of the responsible parties, which party then has the option of suing for contribution or indemnity"); *Krieger v. Trane Co.*, 765 F. Supp. 756, 763 (D.D.C. 1991) (noting that "it is . . . well-settled that joint tortfeasors are not indispensable parties" (citing C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 1623, at 342 & n. 2 (2d ed. 1986)).

Mr. Doe's claims here are based in tort, rather than contract. Even if, as the Greensburg Defendants suggest, "the Vatican and the Diocese of Pittsburgh would be liable for contribution and/or indemnification to the Greensburg Defendants and Cardinal Wuerl for any judgment entered in this case," Greensburg Defs.' Mot., ECF No. 36 at 29; this does not mean they are required parties. "[J]oint and several liability permits the plaintiff to recover full relief from any one of the responsible parties, which party then has the option of suing for contribution or indemnity." *Cronin*, 904 F. Supp. 2d at 41. Therefore, the Greensburg Defendants "potential right to contribution or indemnity" from the Vatican or the Diocese of Pittsburgh does not make the latter two a required party under Rule 19. *Id.*

The Court's analysis is unchanged by the Greensburg Defendants entirely unsupported assertion that "Rule 19 does require the joinder of a primary tortfeasor." Greensburg Defs.' Mot., ECF No. 36 at 29. It is unclear who the Greensburg Defendants consider a "primary tortfeasor," in view of the daily supervision of Mr. Sredzinski by the Greensburg Defendants rather than the Vatican. Finally, the Court is unpersuaded by the Greensburg Defendants' extensive discussion of the role of the Vatican in Mr. Doe's Complaint, or the hypothesized reasons for the exclusion of the two named parties, without any

reference to the legal standard for the joinder of tortfeasors. *See id.* at 25-27. Since the Court concludes that neither the Vatican nor the Diocese of Pittsburgh is a required party, it need not reach the second half of the joinder test, namely "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

### C. St. John The Baptist Parish Is a Proper Party to This Action

The Greensburg Defendants contend that St. John the Baptist Parish is not a proper party to this case because it is an independent entity rather than a "successor entity" to St. Joseph Parish as Mr. Doe alleges. *See* Greensburg Defs.' Mot., ECF No. 36 at 31. Mr. Doe responds that he "has not yet received any discovery from the Greensburg Defendants in this matter and does not believe this argument is appropriate for a motion to dismiss." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 26. The Court agrees with Mr. Doe that it is unable to say at this stage that the only relevant Parish to this lawsuit is St. Joseph Parish, where the alleged abuse occurred.

As per Fed. R. Civ. P. 21, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." The Greensburg Defendants challenge the relevance of St. John the Baptist Church, stating that although the two parishes are partnership parishes that share a pastor and some pastoral

29

resources, they are independent entities. *See* Greensburg Defs.'
Mot., ECF No. 36 at 31. In response, Mr. Doe directs the
Church's attention to the website for the two parishes, which is
a shared one, but proves only that they are partner parishes of
the Diocese of Greensburg. *See* St. John the Baptist and St.
Joseph, https://www.stjohnsandstjosephs.org/pages/default.aspx.
At this juncture, however, it is premature to dismiss St. John
the Baptist Church prior to discovery on the extent to which its
resources have merged with St. Joseph's.

In *Friendship Edison Pub. Charter Sch. Collegiate Campus v.
Murphy*, 448 F. Supp. 2d 166, 170 (D.D.C. 2006), a Court in this
District held that the District of Columbia was not a proper
party defendant in  an action brought by a public charter
school, because it was not involved in processes giving rise to
the administrative decision at issue, it had no control over the
hearing officer's decisions, it could not provide any relief
should the charter school prevail in litigation, and it had no
stake in litigation's outcome. Here, however, depending on the
degree to which the parishes have merged, St. John could provide
relief were Mr. Doe to prevail, and given the shared resources,
may have a stake in the litigation's outcome. The Court
concludes that St. John shall remain a named party, until
discovery provides more certainty that it is not relevant.

### D. **Mr. Doe Has Sufficiently Pled All Five Claims**

#### 1. **Mr. Doe Has Stated a Claim of Negligence**

The Greensburg Defendants argue that Mr. Doe's negligence claim fails as a matter of law because he has not established the existence of a legal duty owed by the Diocese or Parish with regard to the "unsanctioned overnight trips in private hotel rooms and personal vacations that he allegedly took with Father Sredzinski." Greensburg Defs.' Reply, ECF No. 41 at 18. Mr. Doe counters that "[a] church and a diocese have a duty to members of their congregation to protect them from an unreasonable risk of harm during a church-sponsored activity." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 33. Applying the foreseeability of harm test, the Court agrees with Mr. Doe.

A claim alleging the tort of negligence must show: (1) that the defendant owed a duty to the plaintiff; (2) breach of that duty; and (3) injury to the plaintiff that was proximately caused by the breach. *Poola v. Howard Univ.*, 147 A.3d 267, 289 (D.C. 2016). The foundation of any negligence claim is the existence of a duty owed by the defendant to the plaintiff. *Gilbert v. Miodovnik*, 990 A.2d 983, 988 (D.C. 2010). Whether the facts in the record give rise to a legal duty is an issue of law to be determined by the court as a necessary precondition to the viability of a cause of action for negligence. *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1034-35 (D.C. 2015).

The existence of a duty depends on the "foreseeability of harm" test. *Roe v. Doe*, 401 F. Supp. 3d 159, 165 (D.D.C. 2019). "If the injury that befell the plaintiff was 'reasonably foreseeable' to the defendant, then courts will usually conclude that the defendant owed the plaintiff a duty to avoid causing that injury . . . ." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 793 (D.C. 2011). The "test of foreseeability does not require that the negligent [party] should have been able to foresee the injury in the precise form in which it in fact occurred. Rather, it is sufficient if the negligent [party] might reasonably have foreseen that injury might occur." *Keranen v. Nat'l R.R. Passenger Corp.*, 743 A.2d 703, 715 (D.C. 2000). The "relationship between the plaintiff and the defendant" is also a large part in making a determination as to foreseeability. *Hedgepeth*, 22 A.3d at 794.

As a threshold matter, Mr. Doe has alleged that the trips to D.C. included Church-sponsored events, which are the extent of this Court's personal jurisdiction over the Greensburg Defendants. Negligence does not turn on the fact that the injury "occurred at a private hotel in the District of Columbia, not any property or premises owned or operated by the Diocese or Parish." Greensburg Defs.' Mot., ECF No. 36 at 36. Nor does negligence turn on the fact that "the alleged trips occurred while the Plaintiff was in the care and supervision of Father

Sredzinski alone." *Id.* The relevant question for the purposes of negligence is that of the foreseeability of harm, taking into account the relationship between the plaintiff and the defendant.

Here, Mr. Doe has sufficiently pled that "the Diocese and Parish knew or should have known of [Mr.] Sredzinski's sexual interest in children and his capability of committing sexual abuse on children entrusted to the care of the Diocese and Parish on church-sponsored trips." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 33. Mr. Doe alleges that priests in the Diocese had actual knowledge of Mr. Srednzinski's abusive behavior by at least as early as 1991. Compl., ECF No. 1-1 ¶ 47. He further alleges that the Bishop of the Diocese referred to his actual knowledge in a letter to Mr. Sredzinski's sister by at least as early as 1994. *Id.* ¶ 49. Furthermore, Mr. Doe notified the Bishop's office of his own abuse during the 1993 to 1994 timeframe and notified teachers at a diocesan institution by 1995 to 1996. *Id.* ¶¶ 44, 46.  Drawing inferences in Mr. Doe's favor at this stage, given the repeated rape of a minor on Parish premises by a priest, and the information in the Parish and Diocese's possession, the risk during trips to D.C. was something the Diocese and Parish "might reasonably have foreseen." *Keranen*, 743 A.2d at 715.

33

The relationship between the Greensburg Defendants and Mr. Doe serves only to strengthen the legal duty owed by the Greensburg Defendants. Mr. Doe was a parishioner of the Greensburg Defendants, which cannot be called an "arms-length" relationship of the sort in *Roe*, where the plaintiff and defendant had met for the first time on the night at issue. 401 F. Supp. 3d at 166. Contrary to the Greensburg Defendants assertion, *see* Greensburg Defs.' Reply, ECF No. 41 at 18; Mr. Doe has pleaded a close relationship between himself and the Greensburg Defendants. Mr. Doe alleges that the "Plaintiff's care, welfare, and/or physical custody were entrusted to the DIOCESE and PARISH at all times he was under their care and supervision, was on properties and premises operated by them, and/or was on trips to Washington, D.C. coordinated by them." Compl, ECF No. 1-1 ¶ 54. He further alleges that the "DIOCESE and PARISH voluntarily accepted the entrusted care of Plaintiff." *Id.* ¶ 55. The Court takes judicial notice of the Parish's website, which repeatedly describes itself as a "parish family," and "an active parish faith community," which "encourage parishioner involvement." St. John the Baptist and St. Joseph, https://www.stjohnsandstjosephs.org/parish-life/Pages/Organizations.aspx (last accessed Jan 7, 2022). *See also Energy Automation Systems* at 810 n. 1 ("A court may take judicial notice of the contents of an Internet website.")

34

(Internal citation omitted). The Court concludes that the Parish and Diocese had a legal duty to Mr. Doe based on the foreseeability of harm, which is strengthened by the relationship between the two parties. For these reasons, the Court concludes that Mr. Doe has stated a negligence claim against the Greenburg Defendants.

### 2. Mr. Doe Has Stated a Claim of Negligent Supervision

The Greensburg Defendants argue that Mr. Doe's negligent supervision claim fails "for the same reason as his negligence claim – the absence of a legal duty owed by the Diocese or Parish to supervise Father Sredzinski with regard to unsanctioned overnight trips." Greensburg Defs.' Reply, ECF No. 41 at 19. They further argue that the claim also fails because "Plaintiff has not pleaded sufficient facts to establish that the Diocese or Parish failed to adequately supervise Father Sredzinski." *Id.* Mr. Doe responds that "[f]or similar reasons as those described above [with regard to negligence], the Diocese and Parish were bound to valid duties as to Count II.", Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 35. The Court agrees.

In the District of Columbia, the tort of negligent supervision is recognized as formulated in the Second Restatement of Agency, such that:

> "A person conducting an activity through servants or other agents is subject to

> liability for harm resulting from his conduct
> if he is negligent or reckless:
> (a) in giving improper or ambiguous orders or
> in failing to make proper regulations; or
> (b) in the employment of improper persons or
> instrumentalities in work involving risk or
> harm to others;
> (c) in the supervision of the activity; or
> (d) in permitting, or failing to prevent,
> negligent or other tortious conduct by
> persons, whether or not his servants or
> agents, upon premises or with
> instrumentalities under his control."

*Tarpeh-Doe v. United States*, 28 F.3d 120, 123 (D.C. Cir. 1994).

Relevant here, the Restatement provides that the supervised

person need not be an employee or agent to establish liability

under a theory of negligent supervision if the defendant was

"negligent or reckless ... in permitting, or failing to

prevent, negligent or other tortious conduct by persons, ...

upon premises or with instrumentalities under [the defendant's]

control." Restatement (Second) of Agency § 213(d).

The Greensburg Defendants first argue that Mr. Doe's

negligent supervision claim is devoid of any alleged duty owed

by the Diocese or Parish to Mr. Doe on unsanctioned trip. *See*

Greensburg Defs.' Mot., ECF No. 36 at 37. However, the Court has

already concluded that its personal jurisdiction over the

Greensburg Defendants extends to the church-sponsored trips *See*

*supra* § IV(A).[7] The Court has also concluded that the Parish and Diocese had a duty towards Mr. Doe. *See supra* § IV(D)(1).

Second, the Greensburg Defendants contend that the "Plaintiff has not pleaded sufficient facts to establish that the Diocese or Parish failed to adequately supervise Father Sredzinski." Greensburg Defs.' Mot., ECF No. 36 at 37. However, and as discussed previously, *see supra*, Mr. Doe has sufficiently pled that the Diocese and Parish "knew or should have known of Sredzinski's predilection to sexually abuse young boys for the entire six-year period Sredzinski was continually raping and sexually abusing Plaintiff." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 36.

Third, the Greensburg Defendants contend that Mr. Doe "has not alleged, and cannot allege, that Father Sredzinski was an employee of the Parish, which is a requirement of a negligent supervision claim." Greensburg Defs.' Mot., ECF No. 36 at 38. This argument is flawed because it misunderstands the scope of the negligent supervision tort. As the District of Columbia Court of Appeals established in *Brown,* a case the Greensburg Defendants themselves cite, although several cases ". . .

---

[7] For this reason, the Greensburg Defendants' argument that "the Diocese and Parish could not be responsible as a matter of law to supervise Father Sredzinski while on personal excursions with Plaintiff to another state," Greensburg Defs.' Mot., ECF No. 36 at 38; fails.

discuss negligent supervision in the context of an employer-employee relationship and frequently use the term "employee," it is clear from the Restatement and other authorities that a claim of negligent supervision does not require proof that the supervised person was also an employee or agent." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001). Mr. Doe correctly points out that the question for the Court is "whether the Parish had the 'power to control' Sredzinski's conduct 'or the opportunity to alert someone who did have that power in time to prevent the harm.'" Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 36 (citing *Brown,* 782 A.2d at 760). Mr. Doe has sufficiently pled that the Parish and Dioecese had both power and opportunity. Accordingly, Mr. Doe has sufficiently pled his negligent supervision claim.

### 3. Mr. Doe Has Not Pled Breach of a Special Duty or Breach of a Confidential Relationship

The Greensburg Defendants argue that D.C. does not recognize a breach of special duty claim as an independent cause of action, and alternately, if the claim is one of breach of fiduciary or confidential duty, it is subsumed by Mr. Doe's constructive fraud claim. *See* Greensburg Defs.' Mot., ECF No. 36 at 38. Mr. Doe responds that these duties are "essentially interchangeable," Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 27; and the distinction between them is an "unhelpful, pedantic exercise in hair-splitting." *Id.* at 30. Nonetheless, Mr. Doe

argues that even if they are considered separate claims, he has sufficiently pled any of these three alternatives. Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 27. He also asserts that there is no requirement that he cannot separately bring a claim, here, breach of special duty, if it is an essential requirement of another claim, here, constructive fraud. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 28. The Greensburg Defendants reply that Mr. Doe has not established the existence of a generic tort of "breach of special duty," nor has he established the existence of a confidential or fiduciary duty owed by the Diocese and Parish. Greensburg Defs.' Reply, ECF No. 41 at 20-22. The Court addresses each of the arguments in turn.

As a threshold matter, the Court recognizes that the Complaint does plead breach of special duty, as well as the alternatives of confidential or fiduciary duty. *See* Compl., ECF No. 1-1 ¶ 74-77. The Court is also cognizant, as the Greensburg Defendants should have been per the Federal Rules, that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). Further, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Consequently, contrary

to the Greensburg Defendants' assertion, Mr. Doe is free to plead both breach of special duty and constructive fraud, as well as alternatives to breach of special duty. As Mr. Doe points out, the very case the Greensburg Defendants cite in support of their proposition that a breach of special duty claim is subsumed by constructive fraud allows both causes of action to proceed. *See Cordoba Initiative Corp. v. Deak*, 900 F. Supp. 2d 42, 51 (D.D.C. 2012). Having established that Mr. Doe is free to plead claims in the alternative and to bring claims with overlapping requirements, the Court turns to the three theories of breach of duty Mr. Doe puts forward. As the movant for the motion to dismiss, the Greensburg Defendants have the burden to show the non-existence of legal relief.

First, as to the alleged breach of special duty, the Court is unaware of a generic tort for breach of special duty. Mr. Doe argues that The Restatement (Second) of Torts §§ 323, 324A (1965) states the elements of a breach of special duty. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 27. However, and as the Greensburg Defendants point out, the Restatement sets forth the requirements for the torts of *negligent and intentional* breach of a special duty. *See* Greensburg Defs.' Reply, ECF No. 41 at 21. The case Mr. Doe cites in support of his argument does not describe a general tort of breach of special duty, but rather discusses "Plaintiffs' claims for

negligent and intentional breach of special duty." *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 83 F. Supp. 2d 70, 92 (D.D.C. 1999), *aff'd in part, rev'd in part*, 249 F.3d 1068 (D.C. Cir. 2001). The Court concludes that the Greensburg Defendants have met their burden of showing the non-availability of legal relief on Mr. Doe's claim for breach of special duty and that claim is **DISMISSED**.

Second, as to breach of a confidential relationship, the tort comprises the "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 591 (D.C. App. 1985). Although the complaint alleges breach of a confidential relationship, as the Greensburg Defendants point out, it does not allege the disclosures of confidential, nonpublic information that comprise the tort. *See* Compl., ECF No. 1-1 at 17-18. The Court concludes that the Greensburg Defendants have met their burden of showing that Mr. Doe has not sufficiently pled breach of a confidential relationship and that claim is **DISMISSED**.

Third, as to the alleged breach of a fiduciary duty, to state a valid claim, a complaint "must allege facts sufficient to show: (1) the existence of a fiduciary relationship; (2) a breach of the duties associated with the fiduciary relationship;

41

and (3) injuries that were proximately caused by the breach of fiduciary duties." *Friends Christian High Sch. v. Geneva Fin. Consultants*, 39 F. Supp. 3d 58, 63 (D.D.C. 2014). The Greensburg Defendants argue that Mr. Doe's "alleged relationship as a Church parishioner, altar boy and Catholic school attendee is insufficient as a matter of law to establish a fiduciary relationship" because D.C. "does [not] [sic] recognize any type of diocese/parish- parishioner relationship as triggering fiduciary duties." Greensburg Defs.' Mot., ECF No. 36 at 39. Mr. Doe responds that there can be a *confidential* relationship between parishioners and religious institutions, and that "the distinction between a fiduciary relationship and a confidential relationship in this context is an unhelpful, pedantic exercise in hair-splitting." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 29-30. Mr. Doe also asserts that although under District of Columbia law, courts may not have considered the issue of a fiduciary relationship between parishioner and religious institution, other courts have found that such a relationship can exist. *Id.* The Court agrees that it is legally possible for such a relationship to exist.

As a threshold matter, examining the difference, or lack thereof, between a confidential relationship and a fiduciary one is critical to evaluating the claims here. District of Columbia courts have "deliberately left the definition of a 'fiduciary

relationship' open-ended, allowing the concept to fit a wide array of factual circumstances." *Council on American-Islamic Relations v. Gaubatz* ("CAIR 2011"), 793 F. Supp. 2d 311, 341 (D.D.C. 2011); *Millennium Square Residential Ass'n v. 2200 M Street LLC*, 952 F. Supp. 2d 234, 248 (D.D.C. 2013) ("District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new circumstances in which a special relationship of trust may properly be implied."). Generally, "[a] fiduciary relationship is founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Xereas v. Heiss*, 987 F.3d 1124, 1131 (D.C. Cir. 2021) (quoting *Gov't of Rwanda v. Rwanda Working Group*, 227 F. Supp. 2d 45, 64 (D.D.C. 2002)). This definition is extremely similar to that of a confidential relationship, which "arises when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party." *Goldman v. Bequai*, 19 F.3d 666, 674 (D.C. Cir. 1994).

The similarity in these two definitions does not mean, however, that they are strictly interchangeable. It is true that a court in this District has previously held that a claim for a breach of the duty of confidentiality is equivalent to a claim for a breach of a fiduciary duty. *See Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 10 (D.D.C. 2019), *on reconsideration in*

*part*, 518 F. Supp. 3d 43 (D.D.C. 2021). However, the Court of Appeals for the District of Columbia Circuit has treated fiduciary duties as arising from a "special confidential relationship." *Xereas*, 987 F.3d at 1130; *see also Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 279 (D.D.C. 2020), *reconsideration denied*, No. CV 17-1047 (ESH), 2020 WL 5095484 (D.D.C. Aug. 27, 2020) (quoting *Ying Qing Lu v. Lezell*, 919 F. Supp. 2d 1, 6 (D.D.C. 2013)). This interpretation suggests that all fiduciary duties are confidential but that not all confidential duties are fiduciary. Moreover, treating a breach of confidential duty as equivalent to a breach of fiduciary duty would render redundant the D.C. Court of Appeals' recognition of a distinct tort for the breach of confidential relationship. This Court therefore considers these two relationships, and breaches thereof, to be distinct.

Mr. Doe correctly points out that D.C. has recognized a *confidential* relationship between parishioners and religious institutions. *See Roberts-Douglas v. Meares*, 624 A.2d 405, 421 (D.C. Ct. App. 1992)(internal citation and quotation marks omitted) (noting that a "person who stands in a relation of spiritual confidence to another" can create "a relation which naturally creates influence over the mind," fostering an influential relationship even stronger than that of attorney-client, guardian-ward, or parent-child relationships. "The

principal factor leading to a finding of a confidential
relationship . . . was the existence of continuous influential
contacts, generally on a one-to-one basis, between an
unscrupulous spiritual leader and a trusting or otherwise
deferential parishioner.")

The Greensburg Defendants respond that *Meares* is not
determinative in this case however because District of Columbia
courts have not yet contemplated whether a religious institution
can owe a *fiduciary* duty to their parishioners. The Greensburg
Defendants correctly point out that a federal court when
applying D.C. law to a situation not previously addressed by the
D.C. Court of Appeals should be loath to extend the common law
"without some indication that the D.C. Court of Appeals would be
inclined to do the same were it presented with an appropriate
situation." *Tripp v. U.S.*, 257 F. Supp. 2d 37, 46 (D.D.C. 2003).
That is not the case here, though, since the Court in *Meares*
held that the term "confidential relationship," as used in
context of relationship between parishioners and church leaders,
"embraces both *technical fiduciary relations* and those informal
relations which exist when one man trusts and relies upon
another."[8] *Meares*, 624 A.2d at 420 (emphasis added). The Court

---

[8] As Mr. Doe points out, persuasive authority has embraced the
"parishioner-plus rule" which holds that "a fiduciary
relationship does not arise between the church and all

concludes that District of Columbia law could support a
conclusion that the Diocese and Parish owed a fiduciary duty to
Mr. Doe, and that the Greensburg Defendants challenge fails
insofar as it argues that no fiduciary duty is possible.

However, "[w]hether a fiduciary relationship exists is a
fact-intensive question," *Millennium Square*, 952 F. Supp. 2d at
248-49; so "a claim for breach of fiduciary duty is generally

---

parishioners generally" but that "a parishioner plaintiff must
submit facts demonstrating that his relationship with the church
differed from other general parishioners' relationship with the
church." *Doe v. Presiding Bishop of The Church of Jesus Christ
of Latter-Day Saints*, No. 1:09-CV-00351-BLW, 2012 WL 3782454, at
*9 (D. Idaho Aug. 31, 2012); *see also Martinelli v. Bridgeport
Roman Catholic Diocesan Corp.*, 196 F.3d 409, 429 (2d Cir. 1999)
(holding that there was a fiduciary relationship between the
plaintiff and a Catholic diocese because the plaintiff had a
"special and privileged relationship" with a particular priest,
because the plaintiff's mother "entrusted his education, care,
supervision, and safety" to the diocese by having the plaintiff
attend Catholic school from 1st through 12th grade, because the
plaintiff was instructed in catechism classes that the bishop
and diocesan priests were "moral authorities whom he was obliged
to trust and respect," because plaintiff also engaged in
Catholic youth groups and extracurricular activities established
by the diocese, etc.); *Fortin v. The Roman Catholic Bishop of
Portland*, 871 A.2d 1208, 1220 (Me. 2005) (noting that the
plaintiff had "prolonged and extensive involvement with the
church as a student and altar boy," which distinguished him from
a plaintiff "who asserts nothing more than general membership in
a religious organization"); *Rice v. Diocese of Altoona-
Johnstown*, 212 A.3d 1055, 1071 (Pa. Super. Ct. 2019) (embracing
the parishioner-plus rule and noting that "the trend is
increasingly in favor of allowing plaintiffs to assert
individualized, confidential relationships between themselves
and their religious institutions"), *appeal granted*, 226 A.3d 560
(Pa. 2020).

not amenable to dismissal for failure to state a claim when the claimed ground for dismissal is absence of a fiduciary relationship." *CAIR 2011*, 793 F. Supp. 2d at 341. Accordingly, the Court concludes that Mr. Doe may proceed on his claim for breach of fiduciary duty.

### 4. Mr. Doe Has Pled His Fraud-Based Claims With The Requisite Particularity

The Greensburg Defendants next argument regards Counts IV and V of Mr. Doe's Complaint, in which he alleges constructive fraud against the Diocese and Parish, and civil conspiracy by all the Greensburg Defendants, including Bishop Malesic. The Greensburg Defendants argue that these two fraud-based counts must be dismissed as a matter of law because they fail to meet the heightened pleading requirements of Rule 9(b), which governs fraud claims. Greensburg Defs.' Mot., ECF No. 36 at 31. Specifically, the Greensburg Defendants argue that Mr. Doe has failed to meet any of the particularity requirements of Rule 9(b), including the "who, what, when, where, and how" regarding his alleged constructive fraud and civil conspiracy to commit fraud claims. *Id.* at 32. Mr. Wuerl reiterates the Greensburg Defendants argument on particularity. *See* Def. Wuerl's Mot., ECF No. 37 at 22-24; Def. Wuerl's Reply, ECF No. 42 at 6-7.

Mr. Doe responds that given that his fraud counts are based in part on silence in the face of a duty to disclose, it would be "illogical to require [him] to allege specific times and

places where the Diocese or Parish *failed* to inform him or his family of what it knew or should have known about Mr. Sredzinski's sexual proclivities and abusive behavior." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 38-39.  In addition, Mr. Doe argues that he should not be required to plead matters which are "entirely within the exclusive knowledge of the Diocese and Parish (and their agents) and have been withheld from [him] and the public." *Id.* at 40. The Greensburg Defendants reply that absent a fiduciary, confidential, or special duty, the Diocese and Parish had no duty to speak. Greensburg Defs.' Reply, ECF No. 41 at 24. Mr. Wuerl also asserts that he had no duty to speak. Def. Wuerl's Reply, ECF No. 42 at 27. The Court finds that Mr. Doe has pled his fraud claims with the requisite particularity.

"In the District of Columbia, the elements of fraud are: (1) a false representation or willful omission in reference to a material fact, (2) made with knowledge of its falsity, and (3) with intent to induce the party to rely on the representation or omission, where (4) the party relies upon the representation or omission (5) to its detriment." *Cadet v. Draper & Goldberg, PLLC*, No. CIV.A. 05-2105 (JDB), 2007 WL 2893418, at *6 (D.D.C. Sept. 28, 2007) (citing *Schiff v. AARP*, 697 A.2d 1193, 1198 (D.C. 1997)). The elements of constructive fraud differ only in that (1) Plaintiff must allege an innocent or negligent

misrepresentation rather than an intent to deceive, *see Attias*, 365 F. Supp. 3d at 10; and (2) Plaintiff must allege the existence of a confidential relationship between himself and a defendant, *see Cordoba Initiative Corp.*, 900 F. Supp. 2d at 50.

The first element of fraud, a false representation, "may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen." *Rothenberg v. Aero Mayflower Transit Co.*, 495 F. Supp. 399, 406 (D.D.C. 1980); *see also McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 5 (D.D.C. 2009) ("A claim for fraud may be founded on a false representation or a willful omission."). "There is, of course, no question that mere silence does not constitute fraud unless there is a duty to speak." *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C. 1948). Such a duty can arise from a confidential, fiduciary, or special relationship between a plaintiff and defendant that justifies the imposition of the duty. *See Jefferson v. Collins*, 905 F. Supp. 2d 269, 287 (D.D.C. 2012). Alternatively, it can arise from a situation where a material fact is unobservable or undiscoverable by "an ordinarily prudent person upon reasonable inspection." *Cadet*, No. CIV.A. 05-2105, 2007 WL 2893418, at *6 (*quoting Loughlin v. United States*, 230 F. Supp. 2d 26, 50 (D.D.C. 2002)).

To satisfy Fed. R. Civ P. 9(b), which governs fraud claims, a plaintiff must "set forth an adequate factual basis for his allegations," including a "detailed description of the specific falsehoods that are the basis for his suit." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002). Fraud claims must state "the time, place, and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud, as well as the individuals allegedly involved in the fraud." *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 107 (D.D.C. 2013). This includes "notice of the who, what, when, where, and how with respect to the circumstances of the fraud[.]" *Stevens*, 662 F. Supp. 2d at 114.

However, courts outside this district have noted that "while there is a good deal of caselaw that speaks of a journalistic-type approach to [Rule 9(b)'s] requirement of pleading 'with particularity,' that locution really does not fit well in dealing with extended fraudulent schemes involving a large volume of transactions" and thus "a plaintiff is required to provide only a 'general outline' of the alleged scheme sufficient to put defendants on notice about their roles in the fraudulent or false activity." *U.S. ex rel. Salmeron v. Enter. Recovery Sys., Inc.*, 464 F. Supp. 2d 766, 768 (N.D. Ill. 2006) (*quoting Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th

Cir. 1992)). Courts have also observed that "[i]n applying the
first sentence of Rule 9(b) courts must be sensitive to the fact
that its application, prior to discovery, may permit
sophisticated defrauders to successfully conceal the details of
their fraud. Moreover, in applying the rule, focusing
exclusively on its 'particularity' language 'is too narrow an
approach and fails to take account of the general simplicity and
flexibility contemplated by the rules.'" *Christidis v. First
Pennsylvania Mortg. Tr.*, 717 F.2d 96, 99-100 (3d Cir. 1983)
(internal citation omitted); *see also Jepson, Inc. v. Makita
Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("Specificity
requirements may be relaxed, of course, when the details are
within the defendant's exclusive knowledge."); *U.S. ex rel.
Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 385
(5th Cir. 2003) ("[T]he pleading requirements of Rule 9(b) may
be to some extent relaxed where, as is arguably the case here,
the facts relating to the alleged fraud are peculiarly within
the perpetrator's knowledge.").

The Court has already found that the Diocese and Parish had
a legal duty with regard to Mr. Doe, *see supra* §IV(D); which
would by itself be sufficient to give rise to a duty to speak,
at least as to constructive fraud, *see Jefferson*, 905 F. Supp.

2d at 287.[9] For the purposes of the conspiracy to commit fraud
claim, the Court also finds that a duty to speak arises as to
*all* defendants because a material fact, Mr. Sredzinski's
behavior, was unobservable or  undiscoverable by "an ordinarily
prudent person upon reasonable inspection." *Cadet,* No. CIV.A.
05-2105 (JDB), 2007 WL 2893418, at *6 (internal quotation
omitted). Mr. Doe and his family could not have discovered the
alleged dangers Mr. Sredzinski posed upon reasonable inspection,
of which all the defendants were allegedly aware. *See Cadet,* No.
CIV.A. 05-2105 (JDB), 2007 WL 2893418, at *6 (internal quotation
omitted). The Complaint specifically alleges when and how the
defendants ignored Mr. Doe's own attempts to report sexual abuse
and covered up other incidents of abuse. *Id.* ¶¶ 43-49. Mr. Doe
also specifically alleges Mr. Malesic and Mr. Wuerl's knowledge
as to the material fact of Mr. Sredzinski's behavior. *See id.* ¶
42, 45, 97-99. Notably, even if Mr. Malesic or Mr. Wuerl did not
have a duty to speak themselves, they could be liable for a
conspiracy to commit fraud based on *other* defendants' duty to
speak. *See Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir.
1983).

---

[9] The Court has not addressed whether a confidential or fiduciary
duty existed between the Diocese / Parish and Mr. Doe, but they
could also give rise to a duty to speak. *See Jefferson*, 905 F.
Supp. 2d at 28.

The Greensburg Defendants' argument suggesting that Mr. Sredzinski's behavior *was* observable is an astounding one. The Greensburg Defendants assert that because Mr. Doe was "personally aware of Father Sredzisnki's alleged 'predatory behaviour' as early as 1993, when he allegedly 'first reported the abuse,'" the "Diocese and Parish could not have been bound by an *alleged* duty to disclose any alleged 'predatory behavior' on the part of Father Sredzinski that Plaintiff already knew himself and even allegedly reported to others." Greensburg Defs.' Reply, ECF No. 41 at 24-25. Mr. Wuerl makes a similar argument that because Mr. Doe was aware of the alleged false misrepresentations, he cannot now state he has no need to plead knowledge that was exclusively held by the perpetrators. *See* Def. Wuerl's Reply, ECF No. 42 at 8.  In essence, the defendants suggest that having been sexually abused as a child, Mr. Doe can claim neither that Mr. Sredzinski's behavior was unobservable and that they had a duty to disclose, nor that his pleading burden is lessened by exclusive knowledge.

This argument fails for several reasons. First and most obviously, Mr. Doe alleges that he would not have been raped if he and his family had known not to trust Mr. Sredzinski. *See* Compl., ECF No. 1-1 ¶ 107. Accordingly, the duty to speak-at least as to the Diocese and Parish-predated the injury. Second, the Court is unaware, and nor do the Greensburg Defendants nor

Mr. Wuerl point to, any legal authority for the proposition that the duty to speak about the material fact of Mr. Sredzinski's child sexual abuse is dissipated because Mr. Doe–then a minor– was himself being abused. Third, the duty to speak is arguably strengthened by Mr. Doe's own attempts to report the abuse. Instead, Mr. Doe was allegedly ignored, told he was "lying or hallucinating," or that he must be "mentally disturbed," Compl., ECF No. 1-1 ¶ 9; thereby calling into question his knowledge and mental capacity and undermining the Greenburg Defendants and Mr. Wuerl's own argument that Mr. Doe was "well aware" of the abuse Def. Wuerl's Reply, ECF No. 42 at 12. Fourth, the alleged conspiracy is not just fraudulent omission of Mr. Sredzinski's behavior targeted at Mr. Doe, but of Mr. Sredzinski's child abuse of others as well, which was kept from Mr. Doe and his family and could have prevented Mr. Doe being entrusted to Mr. Sredzinski's care and being raped. Fifth, the inescapable fact is that Mr. Doe was a minor; even if Mr. Doe was aware after being raped, defendants allegedly then concealed Mr. Doe's abuse from his family and parishioners, which Mr. Doe alleges was a proximate cause of his repeated rape. This Court cannot sustain the conclusion that Mr. Doe's – then a minor – alleged repeated

rape absolved the defendants of any responsibility to speak to either Mr. Doe or his family thereafter.[10]

Having established that there was a duty to speak, the Court turns to the question of whether the fraud claims have been pled with particularity. The Greensburg Defendants argue that in regard to the "who" for his fraud- based claims, Mr. Doe only vaguely identifies the "Diocese" and the "Parish" without identifying specific individuals, and also refers to "Defendants" collectively, without specifying or distinguishing to which of the four named "Defendants" he may be referring. Greensburg Defs.' Mot., ECF No. 36 at 32. As for the "who, what, when, where, and how" of his fraud-based claims, *see InPhonic*, 662 F. Supp. 2d at 114; the Greensburg Defendants argue that "Plaintiff has failed to provide any specifics for these vague allegations, such as "what" specific allegations of child sexual abuse were allegedly concealed, "when" they were allegedly concealed, and "by whom" they were allegedly concealed. Greensburg Defs.' Mot., ECF No. 36 at 32-33. Mr. Wuerl makes similar arguments. *See* Def. Wuerl's Mot., ECF No. 37 at 23-24; Def. Wuerl's Reply, ECF No. 42 at 13. Mr. Doe responds-and the Court agrees-that he has pled both fraud counts with

---

[10] Mr. Doe's theory of fraud is based not just on a duty to speak but also on false representations. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 34.

sufficiently particularly, based on a duty to disclose as well as false representations. *See* Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 37, 41. The Court addresses each of the considerations—who, what, when, where, and how—in turn.

To the extent the Complaint is based on Mr. Doe's theory of a failure to speak, the logical conclusion is that "[t]he Complaint does not identify a precise statement that contained any alleged misrepresentation." Def. Wuerl's Mot., ECF No. 37 at 23. The Complaint does, however, specifically allege what information was allegedly concealed, when, and by whom, *see* Compl., ECF No. 1-1 ¶¶ 47 (alleging Father Roger Statnick knew that Mr. Sredzinski had sexually abused minors by 1991); *id*. ¶ 49 (alleging that Bishop Bosco (then the leader of the Diocese) knew of Mr. Sredzinski's behavior by 1994); *id.* ¶ 44 (alleging that Mr. Doe had left messages informing Bishop Bosco of his own abuse at age 13); and *id.* ¶ 44-46 (alleging that Mr. Doe informed a nun and a guidance counselor at his Catholic high school (as well as Mr. Wuerl) about his own abuse at age 15).

Mr. Doe also alleges "how" the abuse was concealed. *See*, *e.g.*, *id.* ¶ 45 ("[Mr.] Wuerl denied that anything had happened and told Plaintiff that he must be either lying or hallucinating"); *id.* ¶ 46 ("Plaintiff was not taken seriously and told he must be mentally disturbed and /or hallucinating"); ¶¶ 49, 82-84, 88-95 (alleging all three Greensburg Defendants'

56

policies of covering up and staying silent despite knowledge of
widespread abuse).[11] It would be illogical to ask where and to
whom the alleged misrepresentations were made, since the
underlying argument is the lack of representation. *See* Def.
Wuerl's Mot., ECF No. 37 at 24. Nonetheless, Mr. Doe asserts
that the Diocese and Parish in Greensburg kept critical
information from "Plaintiff, his parents, and the public."
Compl., ECF No. 1-1 ¶ 83. For all these reasons, the Court
concludes that Mr. Doe has pled fraud based on silence in the
face of a duty to speak with sufficient particularity.

To the extent that Mr. Doe's Complaint is also based on
false representation, he has pled that too with sufficient
particularity. Mr. Doe points out that the statements were made
"in various iterations by the Diocese and Parish 25 to 30 years
ago to a young child." Pl.'s Opp'n to Greensburg Defs., ECF No.
39 at 41. He states that "[h]e was instructed in catechism
classes and otherwise that the bishop of the DIOCESE and priests

---

[11] The Greensburg Defendants point to four allegations in the
Complaint that they allege do not meet the "who, what, when,
where, and how" standard. *See* Greensburg Defs.' Reply, ECF No.
41 at 26. However, the sentences they highlight are part of the
larger fraud claim. Fed. R. Civ. P. 9(b) requires that "a party
must state with particularity the circumstances constituting
fraud or mistake." The sentences referred to are simply
describing the circumstances. They are not required individually
to satisfy "who, what, when, where, and how" (which would lead
to absurd outcomes) but considered a part of the fraud
pleadings, which together must satisfy Rule 9(b).

employed by the DIOCESE were moral authorities whom he was
obliged to trust and respect." Compl., ECF No. 1-1 ¶ 73. He
alleges that it was represented by the Diocese and Parish in
school and church services that their priests were "worthy of
being entrusted with children." *Id.* ¶ 20. These allegations
establish the specific misrepresentations, i.e., the "what."
They also establish "when" and "where" – in catechism classes,
school, and church services in Greensburg when Mr. Doe was a
minor.[12] The "how" is satisfied by the allegations that the
Diocese and Church priests were held out as trustworthy and
moral authorities. The "who" is not explicitly stated but can
reasonably be inferred to mean Parish and Diocese instructors
and agents. Given the passage of time, and Mr. Doe's age when
the representations were made, the Court does not find it
necessary that the "who" be more specific, especially since the
names of employees from over two decades ago are "peculiarly
within the perpetrator's knowledge." *U.S. ex rel. Willard.*, 336
F.3d at 385. Mr. Doe's allegations have been pled with

---

[12] This case is therefore distinguishable from those Mr. Wuerl
mentions in his Notice of Supplemental Authority, *see* ECF No.
48; where the allegations fall short of Rule 9(b)'s pleading
standard. *See, e.g.*, *Fay v. Humane Soc'y of United States*, No.
20-CV-1893 (RCL), 2021 WL 184396, at *11 (D.D.C. Jan. 19, 2021)
(stating that "at most, plaintiff alleges that the Humane
Society has "consistently engaged in the use of electronic
radio, television, and print media to fraudulently obtain
charitable donations of money and goods from the public.").

sufficient particularity to put "defendants on notice about their roles in the fraudulent or false activity." *U.S. ex rel. Salmeron*, 464 F. Supp. 2d at 768.

The Court concludes that Mr. Doe has satisfied the heightened pleading standard of Rule 9(b), particularly when considering the duty to speak, the large volume of alleged interactions, and the extent of the information known only to the defendants, rather than him. The Court need not, given the requisite specificity in the Complaint, demand that Mr. Doe allege precise dates, names or locations. Nor does he need to identify with even greater precision the times at which the Defendants withheld information, given their alleged exclusive knowledge. *See Jepson*, 34 F.3d at 1328 (7th Cir. 1994). To demand more detail than what Mr. Doe has already provided on the "who, what, when, where, and how" would potentially permit "sophisticated defrauders to successfully conceal the details of their fraud." *Christidis,* 717 F.2d at 99–100.

### 5. Mr. Doe Has Stated a Claim of Constructive Fraud

The essential elements of a common law fraud claim are: (1) a false representation; (2) in reference to a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) action taken in reliance upon the representation. *Frese v. City Segway Tours of Washington, D.C., LLC*, 249 F. Supp. 3d 230, 236 (D.D.C. 2017). Constructive fraud

includes all the same elements as common law fraud except the intent to deceive, and, in place of requiring a showing of actual dishonesty, it requires a plaintiff to demonstrate the existence of a confidential relationship between the plaintiff and defendant by which the defendant was able to exercise extraordinary influence over plaintiff. *Dentons US LLP v. Republic of Guinea*, 208 F. Supp. 3d 330, 341 (D.D.C. 2016).

Separate from their particularity argument against both fraud-based claims, the Greensburg Defendants present several arguments as to why Mr. Doe has failed to state a claim of constructive fraud against the Diocese or Parish. The Court addresses each of these arguments in turn.

First, the Greensburg Defendants argue that Mr. Doe's alleged diocese/parish-parishioner relationship is not a legally recognized fiduciary relationship, which is fatal to Mr. Doe's constructive fraud claim. Greensburg Defs.' Mot., ECF No. 36 at 41. Mr. Doe responds that "D.C. does not require that constructive fraud be based on a fiduciary, as opposed to confidential, relationship, to the extent that those two are distinguishable." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 42 (citing *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 461 (D.D.C. 1997).

At the outset of its analysis, the Court notes that it has already distinguished between a confidential relationship, and a

fiduciary relationship, which is a "special confidential relationship." *Xereas*, 987 F.3d at 1130. As Mr. Doe asserts, constructive fraud requires only the former. Whether two parties are in a confidential relation is a fact-specific inquiry. *Goldman v. Bequai*, 19 F.3d 666, 674 (D.C. Cir. 1994). That factual question cannot be resolved on a motion to dismiss. *Dentons*, 208 F. Supp. 3d at 340. Therefore, Mr. Doe's claim cannot fail at this stage because of the absence of a confidential relationship. The Court finds it unnecessary to address both parties' arguments as to whether such a relationship exists.

Second, the Greensburg Defendants argue that Mr. Doe uses only generalized statements to assert the "false representation" element of a fraud claim and provides no "particular answers to material questions." Greensburg Defs.' Mot., ECF No. 36 at 42. This argument is essentially the same as the Greensburg Defendants particularity argument, which this Court has already addressed. *See supra* §IV(D)(4).

Third, and relatedly, the Greensburg Defendants argue that Mr. Doe does not plead with particularity how any of the representations were false, or what information the Diocese or Parish had when the representations were made. *Id.* at 42-43. The Complaint clearly states that the representations as to Mr. Sredzinski were false because the Diocese and Parish were aware

of Mr. Sredzinski's abuse as far back as 1991. *See* Compl., ECF No. 1-1 ¶¶ 44-49. The Complaint also alleges what information they had. *Id.*

Fourth, the Greensburg Defendants assert that Mr. Doe "has not alleged that the Diocese or Parish made any *particular* false representation about Father Sredzinski," nor has he alleged any action he took in reliance thereof. Greensburg Defs.' Mot., ECF No. 36 at 43. The Court agrees that Mr. Doe does not single out a false representation made only as to Mr. Sredzinski. However, the Greensburg Defendants do not point to caselaw that requires the false representation to be about just one person. Moreover-and decisive here-as the Court has already discussed, Mr. Doe's claim is not just based on false representation, but also on misrepresentation through failure to disclose a material fact as to Mr. Sredzinski of which the Greensburg Defendants were aware. *See supra* IV(D)(4). Mr. Doe also specifically alleges reliance. *See* Compl., ECF No. 1-1 ¶ 84.

Fifth, the Greensburg Defendants argue that Mr. Doe has not pleaded a cognizable injury he suffered because of the Greensburg Defendants' misrepresentation, as opposed to the alleged abuse by Father Sredzinski. Greensburg Defs.' Mot., ECF No. 36 at 43. The Greensburg Defendants further assert that "economic harm is an essential element of a fraud claim; emotional harm is not recoverable." *Id.* at 44 (citing *Bond v.*

*U.S. Dep't of Justice*, 828 F. Supp. 2d 60, 81 (D.D.C. 2011)).
Mr. Doe responds that his damages are the proximate result of
fraud because he and his family relied on the Greensburg
Defendants' misrepresentations. Pl.'s Opp'n to Greensburg Defs.,
ECF No. 39 at 44. Mr. Doe also adds that the rule in D.C. is
that "a plaintiff may recover emotional damages that are the
natural and proximate result' of the defendant's conduct." *Id.*
(citing *Osbourne v. Capital City Mortg. Corp.*, 667 A.2d 1321,
1328 (D.C. 1995)).

Before turning to the question of whether Mr. Doe has pled
a cognizable injury for which this Court could provide relief,
the Court considers the relevant legal standard. The Greensburg
Defendants refer incorrectly to a standard that applies to
claims *in contract* instead of claims *in tort. See Bond*, 828 F.
Supp. 2d at 81. Mr. Doe, meanwhile, ignores conflicting
authority stating that "the economic torts of fraud and
constructive fraud require some showing of economic harm in
order for the plaintiff to recover emotional damages as well."
*Attias v. CareFirst, Inc.,* 365 F. Supp. 3d 1, 17 (D.D.C.
2019), *on reconsideration in part*, 518 F. Supp. 3d 43 (D.D.C.
2021). Since local law is being applied, the Court defers to the
standard articulated by the D.C. Court of Appeals, which
discusses the division of courts on the issue of whether
economic harm must be alleged, before unambiguously deciding

that emotional damages are recoverable so long as *intentional* misrepresentation can be proven. *Osbourne*, 667 A.2d at 1328. Since constructive fraud is based on *negligent* misrepresentation, *see Attias*, 365 F. Supp. 3d at 10; emotional damages are not recoverable. Mr. Doe, however, also asserts economic damages, specifically "a loss of earnings and earnings capacity." Compl., ECF No. 1-1 ¶ 59.

Turning to Mr. Doe's alleged injury, the Court is not persuaded that Mr. Doe "has not established any alleged damages to support his constructive fraud claim." Greensburg Defs.' Reply, ECF No. 41 at 26-27. The legal standard demands that "[t]o prevail on [a fraud] claim, the plaintiff must also have suffered some injury as a consequence of his reliance on the misrepresentation." *Busby v. Capital One, N.A.*, 772 F. Supp. 2d 268, 275 (D.D.C. 2011). Liability for constructive fraud extends to damages that are "the natural and proximate consequences, or the direct consequences of the fraud, and to such damages as can be clearly defined and ascertained." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 793 (D.C. Cir. 1983). Mr. Doe's alleged repeated rape as a child can be attributed to Mr. Sredzinski, but Mr. Doe has also alleged that it was a proximate result of the fraud because he and his family relied on the Greensburg Defendants misrepresentations. *See* Compl., ECF No. 1-1 ¶ 84-85. There can be more than one cause of an injury, and the

Greensburg Defendants do not provide any authority in support of their assertion that the injury from fraud must be "separate and distinct" from the injuries from Mr. Sredzinski's abuse. *See* Greensburg Defs.' Mot., ECF No. 36 at 44. Accordingly, the Court concludes that Mr. Doe has pled a claim for constructive fraud.

### 6. Mr. Doe Has Stated A Claim Of Civil Conspiracy To Commit Fraud

The elements of a civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one to the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *Mensah-Yawson v. Raden*, 170 F. Supp. 3d 222, 230 (D.D.C. 2016). There is no independent action in the District of Columbia for civil conspiracy; it is a means for establishing vicarious liability for an underlying tort. *See Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 42 (D.D.C. 2013). Under District of Columbia law, "one who alleges a conspiracy must allege an event, conversation, or document showing that there was an agreement among the alleged conspirators." *Id.*

As a threshold matter, Mr. Wuerl argues that conspiracy to commit constructive fraud is a legal impossibility, because a civil-conspiracy claim requires specific intent, whereas constructive fraud deploys an innocent or negligent

misrepresentation standard. *See* Def. Wuerl's Mot., ECF No. 37 at
16. Mr. Doe responds that Count V is not concerned with
*constructive* fraud, but with "Civil Conspiracy to Commit Fraud."
Compl., ECF No. 1-1 at 20. Mr. Wuerl replies that because the
standalone tort in Mr. Doe's Complaint is the lesser claim of
constructive fraud, the inference is that the parties against
whom constructive fraud is alleged did not commit the common law
fraud necessary to sustain his conspiracy allegations. *See* Def.
Wuerl's Reply, ECF No. 42 at 10. The Court disagrees.

The Court is not aware why Mr. Doe chose to bring a
constructive fraud claim against the Diocese and Parish, and a
conspiracy to commit fraud claim against a larger group of
defendants. But the Court cannot agree that "the inescapable
conclusion is that Plaintiff was alleging a conspiracy to commit
constructive, rather than common law, fraud." Def. Wuerl's
Reply, ECF No. 42 at 10. It is possible, for instance, that Mr.
Doe thought he could prove a *conspiracy* to commit fraud but not
common law fraud. It is also misleading for Mr. Wuerl to attach
any standalone relevance to Mr. Doe's reference to his
constructive fraud pleadings in his opposition to the Greensburg
Defendants' Motion to Dismiss. Set in context, Mr. Doe states
that given the underlying tort for the conspiracy is fraud, the
Court can "ignore Wuerl's laborious arguments . . . that
constructive fraud was not adequately pled as to Wuerl." Pl.'s

Opp'n to Def. Wuerl, ECF No. 40 at 8-9. Mr. Doe subsequently refers to where he addresses the question of whether constructive fraud has been pled *as to the Parish and Diocese*. *Id.* It cannot reasonably be inferred that this reference amounts to a negation of Mr. Doe's entire argument on the point, nor is it appropriate for the Court to draw such an inference. The Court concludes that Mr. Doe is alleging a conspiracy to commit fraud, *not* constructive fraud.[13]

Turning to claims challenging conspiracy to commit fraud, the Greensburg Defendants and Mr. Wuerl both present several arguments as to why Mr. Doe's claim is legally insufficient. First, the Greensburg Defendants and Mr. Wuerl both argue that Mr. Doe has failed to plead any specific facts establishing an agreement between persons in the furtherance of a common scheme.

---

[13] Consequently, the Court need not address Mr. Wuerl's arguments as to constructive fraud, a claim which does not apply to him. This includes Mr. Wuerl's argument that he is not legally capable of committing constructive fraud as well as his assertion that Mr. Doe has failed to adequately plead constructive fraud. *See* Def. Wuerl's Mot., ECF No. 37 at 19, 2. The Court also does not reach the Greensburg Defendants argument that Mr. Doe has failed to state a claim for civil conspiracy because he "has not established a legally cognizable claim for *constructive* fraud." Greensburg Defs.' Mot., ECF No. 36 at 45 (emphasis added). Finally, the Court does not reach the supplemental authority provided by Mr. Wuerl, because it is not the case that Mr. Doe pled only constructive fraud. *See* Notice of Supplemental Authority, ECF No. 49 at 2 (referencing *Rice v. Diocese of Altoona-Johnstown*, No. 3 WAP 2020, 2021 WL 3073157 (Pa. July 21, 2021)).

*See* Greensburg Defs.' Mot., ECF No. 36 at 45; Def. Wuerl's Mot., ECF No. 37 at 28; *Geier*, 983 F. Supp. at 42. The Greensburg Defendants add that Mr. Doe bears the burden to plead with particularity but has relied only on general averment. *See* Greensburg Defs.' Reply, ECF No. 41 at 27. Mr. Doe responds that he is not required to point to events, conversations, or documents showing an agreement among the co-conspirators. Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 44-45. The Court concludes that Mr. Doe has pled enough circumstantial allegations to survive a motion to dismiss.

"Because the typical conspiracy is rarely evinced by explicit agreements," this Court has found that that a "plaintiff's allegations of circumstantial evidence" can survive a motion to dismiss. *City of Moundridge, KS v. Exxon Mobil Corp.*, 471 F. Supp. 2d 20, 40 (D.D.C. 2007); *see also Halberstam*, 705 F.2d at 477 ("The element of agreement is a key distinguishing factor for a civil conspiracy action. Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement."); *Weishapl v. Sowers*, 771 A.2d 1014, 1024 (D.C. 2001) ("Where there is no direct evidence of an agreement between the alleged co-conspirators, there must be circumstantial evidence from which a common intent can be inferred."). Mr. Doe sufficiently pleads circumstantial evidence

suggesting that there was a common intent to fraudulently conceal child abuse. *See* Compl., ECF No. 1-1 ¶¶ 88-99.

Mr. Wuerl argues that Mr. Doe's allegations are comparable to those that have failed in other courts. *See* Def. Wuerl's Mot., ECF No. 37 at 29. However, the present case is distinguishable for several reasons. First, the Complaint here does not simply allege "failure to take action." *Doe v. Hartford Roman Catholic Diocesan Corp.*, No. X10UWYCV105015963, 2014 WL 2581049, at \*4 (Conn. Super. Ct. May 9, 2014). It pleads that the defendants were aware of Mr. Sredzinski's behavior as far back as 1991 and sought to cover it up. *See, e.g.*, Compl., ECF No. 1-1 ¶ 49. Second, two of the three opinions Mr. Wuerl references are on motions for summary judgment, which employed a different standard than that applicable to a motion to dismiss. *See Hartford Roman Catholic Diocesan Corp.*, No. X10UWYCV105015963, 2014 WL 2581049, at \*4; *Nelligan v. Norwich Roman Catholic Diocese*, No. X07CV020084287S, 2006 WL 1828532, at \*3 (Conn. Super. Ct. June 15, 2006). That leaves a case from Rhode Island, where the court held that a claim for conspiracy could not be stated where "the complaint is devoid of any specific allegations regarding the existence of such an agreement." *Smith v. O'Connell*, 997 F. Supp. 226, 241 (D.R.I. 1998).

This Court, however, is bound by authority holding that "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam*, 705 F.2d at 477. Moreover, persuasive precedent within this District holds that a "plaintiff's allegations of circumstantial evidence" can survive a motion to dismiss. *City of Moundridge,* 471 F. Supp. 2d at 40. The Court accordingly concludes that Mr. Doe has sufficiently pled circumstantial evidence suggesting that there was a common intent to fraudulently conceal child abuse. *See* Compl., ECF No. 1-1 ¶¶ 88–99; *see also* Compl., ECF No. 1-1 ¶ 49. The Court is also cognizant that other courts have allowed conspiracy claims on similar pleadings, including against Mr. Wuerl. *See Perfetto v. Diocese of Pittsburgh, et al.,* Case No. GD-20-5140 (Ct. Common Pleas, Allegheny Cty., Pa.).[14]

_____

[14] Mr. Wuerl contends that "the most striking omission in Plaintiff's Opposition is its failure to address the numerous cases that Wuerl cited where district courts have dismissed virtually identical fraud claims because of virtually identical deficiencies." Def. Wuerl's Reply, ECF No. 42 at 16. However, these cases were cited as part of Mr. Wuerl's argument that Mr. Doe has failed to adequately plead *constructive* fraud. Since this is a claim that Mr. Wuerl is not a party to, Mr. Doe did not address Mr. Wuerl's arguments. *See* Pl.'s Opp'n to Def. Wuerl, ECF No. 40 at 9. Mr. Wuerl's reply then extends these cases to his arguments against a claim of fraud. Def. Wuerl's Reply, ECF No. 42 at 16.

The Court is mindful that none of the three cases Mr. Wuerl puts forth are based on a theory of a duty to disclose. Moreover, in *Doe*, the Court dismissed the fraud claim not because of the misrepresentation allegations, but because there was no evidence that "the defendant knew that such a representation was false or was reckless as to whether it was

Second, Mr. Wuerl asserts that Mr. Doe has failed to
"sufficiently allege that a speaker made any [] 
misrepresentation with knowledge of its falsity." Def. Wuerl's
Mot., ECF No. 37 at 26. However, the complaint specifically
alleges when and how the Greensburg Defendants ignored Mr. Doe's
own attempts to report sexual abuse and also covered up other
incidents of abuse, of which they had knowledge as early as
1991. Compl., ECF No. 1-1 ¶¶ 43-49. This allegation dispenses
with Mr. Wuerl's contention that that there was no knowledge of
falsity, *see* Def. Wuerl's Mot., ECF No. 37 at 25-26; and allows
the Court to "reasonably infer knowledge or another mental

---

true or false.". *Doe v. Catholic Soc'y of Religious & Literary
Educ.*, No. H-09-1059, 2010 WL 345926, at *14 (S.D. Tex. Jan. 22,
2010). In *Boy Scouts*, the allegations brought by Plaintiff
generally concerned "adult scout leaders" rather than specific
individuals. *See* Boy 7 v. Boy Scouts of Am., No. CV-10-449-RHW,
2011 WL 2415768, at *4 (E.D. Wash. June 13, 2011). *Doe I*
provides similar allegations, but less specific ones than
presented herein; unlike *Doe I*, the present case does not just
allege the *impression* created by the defendant, but also the
*instructions* given by the Defendants that the Parish's priests
were moral authorities. *Compare Doe I v. Roman Catholic Diocese
of Galveston-Houston*, No. H-05-1047, 2006 WL 8446968, at *11
(S.D. Tex. Mar. 7, 2006) ("Archdiocese Defendants 'fraudulently
misrepresented material facts' and provided 'partial disclosure
that created a false impression' that [the alleged abuser] 'was
a celibate, sexually safe, moral cleric who would not be
sexually dangerous to minors") *with* Compl., ECF No. 1 ¶ 73 (Mr.
Doe was "instructed in catechism classes and otherwise that the
bishop of the DIOCESE and priests employed by the DIOCESE were
moral authorities whom he was obliged to trust and respect.")

state." *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 132 (D.D.C. 2008). Federal Rule of Civil Procedure 9(b) permits knowledge to "be alleged generally." Fed. R. Civ. P. 9(b).

Third, Mr. Wuerl states that Mr. Doe does not specify "how he took an action in reliance on an alleged misrepresentation and thereby suffered an injury." Def. Wuerl's Mot., ECF No. 37 at 24-26. The Court agrees with Mr. Wuerl that "[t]he question is whether Plaintiff *did* detrimentally rely on any alleged misrepresentations, not whether he *could have* relied on them." Def. Wuerl's Reply, ECF No. 42 at 15. The Complaint alleges such reliance, asserting that in trusting Mr. Doe to Mr. Sredzinski's care, he and his family "reasonably relied on the Diocese and Parish's omission of these facts [as to Mr. Sredzinski's behavior], and/or statements in sermons, catechism classes, and other teachings that Catholic priests were trustworthy authority figures." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 11; *see also* Compl., ECF No. 1-1 ¶ 20, 73, 84.

Mr. Doe also alleges that his repeated rape as a child was a proximate result of the fraud because he and his family relied on the Greensburg Defendants misrepresentations. *See* Compl., ECF No. 1-1 ¶ 84-85. Mr. Doe has therefore specified "how he took an action in reliance on an alleged misrepresentation and thereby suffered an injury." Def. Wuerl's Mot., ECF No. 37at 22-26. *See also McManemy v. Roman Catholic Church of Diocese of Worcester*,

2 F. Supp. 3d 1188, 1197 (D.N.M. 2013) ("A major component of fraud requires the inducer to make a misrepresentation to the plaintiff on which the plaintiff detrimentally relies. Without such targeted misrepresentation, there can be no proximate cause between the inducer's act (the misrepresentation) and the injury to plaintiff.").

Fourth, the Greensburg Defendants and Mr. Wuerl both argue that as with constructive fraud, Mr. Doe has not pleaded a cognizable injury suffered as a direct and proximate result of conspiracy to commit fraud. *See* Greensburg Defs.' Mot., ECF No. 36 at 46; Def. Wuerl's Mot., ECF No. 37 at 31. The Court has already concluded that Mr. Doe has sufficiently alleged *constructive* fraud was a proximate cause of his alleged abuse. *See supra* §IV(D)(5). The same holds true for fraud here. Mr. Doe is not required to separate the damages from the abuse from the damages from the conspiracy which led to the abuse, and neither Mr. Wuerl nor the Greensburg Defendants cite any authority suggesting otherwise.

Fifth, the Greensburg Defendants argue that "Plaintiff's Complaint is entirely devoid of any allegations establishing that Bishop Malesic was engaged in a conspiracy to conceal Plaintiff's allegations specifically, or alleged abuse by Father Sredzinski generally." Greensburg Defs.' Mot., ECF No. 36 at 46. Mr. Doe "agrees that Bishop Malesic never concealed abuse from

Plaintiff or his family while Plaintiff's abuse by Sredzinski
was ongoing." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 46.
Rather, Mr. Doe asserts that he "pleads circumstantial evidence
that [Bishop] Malesic joined the conspiracy via overt acts that
started well before his tenure but continue to the present day,
including by utilizing various practices to conceal sexual abuse
from the public and deny responsibility for it." *Id.* The
Greensburg Defendants respond that Mr. Doe's position is
untenable because the conspiracy as alleged was "*entirely
complete* in 1997- some *18 years before* Bishop Malesic allegedly
joined the purported conspiracy." Greensburg Defs.' Reply, ECF
No. 41 at 28. The Court disagrees.

       The question for the Court is whether Mr. Doe has pled that
Mr. Malesic joined the conspiracy to conceal Mr. Sredzinski's
alleged child abuse, not just of Mr. Doe but of other children
as well. In relevant part, the Court notes at the outset that
contrary to the Greensburg Defendants assertion, the alleged
conspiracy to cover up Mr. Sredzinski's behavior was not over in
1997, *see* Greensburg Defs.' Reply, ECF No. 41 at 28; rather, Mr.
Doe asserts that the conspiracy started "before [he] was abused
and continues to this day." Compl., ECF No. 1-1 ¶ 87. In other
words, Mr. Doe's argument is that his abuse at the hands of Mr.
Sredzinski may have ended in 1997, but the *cover up* of Mr.
Sredzinski's behavior is allegedly still ongoing. Therefore, it

is not the case that "Bishop Malesic could not have joined the conspiracy actually alleged." Greensburg Defs.' Reply, ECF No. 41 at 28. Given the alleged continued nature of the conspiracy, it is also not significant that Mr. Doe accepts that Bishop Malesic did not conceal Mr. Sredzinski's abuse of Mr. Doe while it was ongoing. *See id.* The fact that Bishop Malesic agreed to conceal Mr. Sredzinski's child sexual abuse at any time after would suffice. *See United States v. Bridgeman*, 523 F.2d 1099, 1108 (D.C. Cir. 1975) ("An individual who joins an already formed conspiracy knowing of its unlawful purpose may be held responsible for acts done in furtherance of the conspiracy both prior to and subsequent to his joinder.") (Internal citation omitted).[15]

In the Complaint, Mr. Doe alleges circumstantial evidence that Mr. Malesic is withholding information about child abuse, including abuse by Mr. Sredzinski, who is one of the twenty-one priests that Bishop Malesic admitted were "credibly" accused of

---

[15] Contrary to the Greensburg Defendants' assertion, the Complaint also does not suggest that Bishop Malesic "committed an overt act that *caused* Plaintiff's sexual abuse in 1991-1997." Greensburg Defs.' Reply, ECF No. 41 at 27. Nor does the relevant legal standard require an overt act by Bishop Malesic that caused the alleged damage; it requires only an agreement between co-conspirators, and an overt act by one of them. *See Raden*, 170 F. Supp. 3d at 230.

sexual misconduct. *See* Compl., ECF No. 1-1 ¶¶ 98-99 (listing
pertinent information that Mr. Malesic has but is allegedly
fraudulently concealing). Mr. Doe also alleges that "[e]ach
defendant undertook overt acts in furtherance of the common
scheme." *Id.* ¶ 92. The Court concludes that Mr. Doe has
sufficiently pled his claim of conspiracy, including against
Bishop Malesic.

Sixth, Mr. Wuerl argues that "Plaintiff never articulates
how the conspirators entered into the agreement with the
specific intent to participate in an unlawful act, which as
alleged here is constructive fraud." Def. Wuerl's Mot., ECF No.
37 at 30. Since the conspiracy does not concern constructive
fraud, the Court does not reach this argument. As for Mr.
Wuerl's related assertion that Mr. Doe has offered only "brief
allegations regarding the purported object of the agreement,"
the Court is cognizant that the Complaint repeatedly states the
object of the conspiracy is a desire to preserve the reputation
of the Catholic Church. *See* Compl., ECF No. 1-1 ¶¶ 26, 49, 63-
64.

Seventh, Mr. Wuerl argues that even if Mr. Doe has
adequately pled a conspiracy to commit fraud, he has failed to
adequately plead that Mr. Wuerl joined such a conspiracy. Def.
Wuerl's Mot., ECF No. 37 at 31. Mr. Doe responds that the
Complaint alleges through circumstantial evidence that Mr. Wuerl

joined other institutions and church leaders in an agreement to cover up child sexual abuse by priests in the Catholic Church. *See* Pl.'s Opp'n to Def. Wuerl, ECF No. 40 at 13. The Court agrees.

The circumstantial evidence includes allegations that: (1) when Mr. Wuerl personally witnessed a minor being raped by a priest multiple times in D.C., he did absolutely nothing to stop it, Compl., ECF No. 1-1 ¶ 42; (2) when Mr. Wuerl was confronted by Mr. Doe later on, Mr. Wuerl's position was that Mr. Doe was "lying or hallucinating," *id.* ¶ 45; (3) Mr. Wuerl, through counsel, used the threat of a defamation suit many years later in the hopes of silencing Mr. Doe, *id.* ¶ 97; (4) a Pennsylvania grand jury found that Mr. Wuerl "allowed numerous priests whom he knew to be abusive to continue in active ministry or to remain in good standing when they were transferred to other dioceses," *id.* ¶ 95; and (5) Mr. Wuerl has made statements about his actions with respect to the abuse scandal that the Pennsylvania Attorney General has referred to as "not telling the truth", *id.*

Mr. Wuerl responds that: (1) even if the first allegation were true, it is no plausible basis for inferring agreement to enter into a conspiracy to commit fraud; (2) Mr. Wuerl's response was the "natural" response one would expect from someone wrongly accused; (3) his "preservation and enforcement

of his legal rights do not show that he joined a conspiracy to defraud Plaintiff"; (4) the Grand Jury Report was fundamentally deficient and never claims that Mr. Wuerl had anything to do with Mr. Sredzinski, the Parish or the Greensburg Diocese; and (5) the Pennsylvania Attorney General disagreeing with Wuerl does not show that Mr. Wuerl entered into a conspiracy to commit fraud. Def. Wuerl's Reply, ECF No. 42 at 23-25.

At this juncture, all factual discrepancies must be drawn in favor of Mr. Doe. *See Crane*, 894 F.2d at 456. Applying this standard, the allegation that Mr. Wuerl stood by and watched while Mr. Doe was allegedly raped certainly circumstantially indicates agreement to commit fraud. The Court agrees with Mr. Wuerl that Mr. Wuerl's "alleged failure does not establish a conspiracy to commit fraud," Def. Wuerl's Reply, ECF No. 42 at 23; but Mr. Doe need only provide circumstantial evidence at this stage, *see City of Moundridge,* 471 F. Supp. 2d at 40. Similarly, Mr. Wuerl's alleged response to Mr. Doe, stating that he was lying or hallucinating, could have been in response to being wrongly accused, but drawing inferences in Mr. Doe's favor, it provides further circumstantial evidence, as does the Grand Jury Report.[16] Mr. Wuerl is right that "nothing in the

---

[16] Mr. Wuerl lays out several reasons the Grand Jury Report is flawed. However, since this is a motion to dismiss, all inferences are drawn in favor of the Plaintiff, and the Court

Report suggests [Mr.] Wuerl ever agreed to commit fraud against Plaintiff" specifically, Def. Wuerl's Reply, ECF No. 42 at 24; but that is why the Report, along with the Attorney General's statement, provide circumstantial evidence of the alleged conspiracy. The Court's role at this stage is not to consider the "obvious alternative explanation," Def. Wuerl's Reply, ECF No. 42 at 25; but to draw inferences in the Plaintiff's favor, *Kowal*, 16 F.3d at 1276.

Mr. Wuerl also argues even if he had joined the conspiracy, the Complaint does not establish that Mr. Doe suffered an injury thereafter from an overt act in furtherance of that agreement. *See* Def. Wuerl's Mot., ECF No. 37 at 32. This is easily addressed – Mr. Doe's alleged injury is his repeated rape, and Mr. Wuerl, as alleged in the Complaint, joined the conspiracy at least as early as 1995, when Mr. Doe confronted him about the abuse. *See* Compl., ECF No. 1-1 ¶ 45. The abuse continued until 1997, *id.* ¶ 3; hence, the Complaint does establish an injury thereafter. Moreover, as discussed earlier with regard to Bishop Malesic, the Complaint alleges the conspiracy is ongoing, and Mr. Wuerl cites no legal authority requiring the injury to Mr. Doe to have occurred *before* a new conspirator joined. The allegation that Cardinal Wuerl allegedly agreed to conceal Mr.

---

does not address such issues here. *See* Def. Wuerl's Reply, ECF No. 42 at 20-21.

Sredzinski's child sexual abuse while the conspiracy was ongoing is sufficient. *See Bridgeman*, 523 F.2d at 1108.

The Court also deems it irrelevant that the "negligence, breach of special duty, and constructive fraud counts do not name [Mr.] Wuerl," or that Mr. Wuerl was not a party to a similar lawsuit in a different state. Def. Wuerl's Mot., ECF No. 37at 32. It is Mr. Doe's prerogative as Plaintiff whom he brings claims against and for what. The relevant question for this Court is simply the sufficiency of the pleadings, which are sufficient here to establish a claim for conspiracy to commit fraud.

### E. Mr. Doe Is Not Required To File A More Definite Statement Pursuant To Fed. R. Civ. P. 12(E)

Finally, the Greensburg Defendants argue that Mr. Doe should be required to file a more definite statement because the Complaint "wholly fails to provide any additional details on these alleged trips [to D.C.] and, specifically, the Greensburg Defendants' alleged role or involvement in these trips, if any." Greensburg Defs.' Mot., ECF No. 36 at 47. Mr. Doe responds that the trips have already been explained, and that he "has no idea at this point what individuals at the Diocese or Parish coordinated any of these trips and would not be able to include this information in any more definite pleadings." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 48. The Court agrees that Mr. Doe is not required to file a more definite statement.

Fed. R. Civ. P. 12(e) provides that: "[i]f a pleading to
which a responsive pleading is permitted is so vague and
ambiguous that a party cannot reasonably be required to frame a
responsive pleading, the party may move for a more definite
statement before interposing a responsive pleading." Here, the
Complaint does not state precisely, or even approximately, how
many of the alleged trips to D.C. were church sanctioned.
However, the Complaint is not vague or ambiguous, and it is not
the case that defendants cannot "reasonably be required to frame
a responsive pleading." Fed. R. Civ. P. 12(e). Mr. Doe alleges
that there were several church-sponsored trips to D.C. on which
he was raped. *See* Compl., ECF No. 1-1 ¶¶ 37-38 ("Sredzinski
would take Plaintiff to an annual Catholic pro-life rally as
well as other political events in Washington, D.C., trips that
Sredzinski coordinated in conjunction with the DIOCESE, bishops
of the DIOCESE, and/or the PARISH. Sredzinski also took
Plaintiff and other boys to Washington, D.C. for basketball and
bowling competitions with other churches, which Sredzinski
coordinated in conjunction with the DIOCESE, bishops of the
DIOCESE, and/or the PARISH.").

The Greensburg Defendants argue that their connection to
these overnight trips is "tenuous at best," but the Court is
unpersuaded. As Mr. Doe emphasizes, "[t]he Diocese of Greensburg
describes its 'annual pilgrimage' to the Washington, D.C. March

for Life event *on its own website, and is actively selling tickets to it right now*." Pl.'s Opp'n to Greensburg Defs., ECF No. 39 at 48. *See March for Life Youth Pilgrimage*, Roman Catholic Diocese of Greensburg, https://www.dioceseofgreensburg.org/youth/Pages/marchforlifeya.a spx ("The Office of Faith, Family, and Discipleship sponsors a youth pilgrimage to the March for Life in Washington, D.C., each January."); *March for Life*, Roman Catholic Diocese of Greensburg, https://www.dioceseofgreensburg.org/ministries/Pages/advocacyfor life.aspx (noting that "[t]he March for Life began as a small demonstration [in 1974] and rapidly grew to be the largest pro-life event in the world"). The Parish has also coordinated bus trips for these events in the past. *Nature Programs Continue at Library*, Trib Live, https://archive.triblive.com/news/nature-programs- continue-at-library-2/ ("St. Joseph's parish and youth group will take a charter bus to Washington, D.C., Jan. 22 for the 36th annual 'March for Life.'").

The issues of exactly how many trips took place, for what purposes, and coordinated by whom, are more appropriate for discovery. The Diocese and Parish are better suited to answer these questions than Mr. Doe is through additional statements.

## V.   Conclusion

For the foregoing reasons, the Greensburg Defendants' Motion to Dismiss, ECF No. 36; is **GRANTED IN PART** and **DENIED IN PART**; and Mr. Wuerl's Motion to Dismiss, ECF No. 37, is **DENIED.** An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

> **Signed:   Emmet G. Sullivan**
> **United States District Judge**
> **January 24, 2022**